[No. 22676-6-II.    Division Two.    August 20, 1999.]

UNITED STATES TOBACCO SALES AND MARKETING COMPANY, INC., *Appellant*, v. THE DEPARTMENT OF REVENUE, *Respondent*.

*Norman J. Bruns* and *William C. Severson* of *Garvey, Schubert & Barer*, for appellant.

*Christine O. Gregoire, Attorney General*, and *John Gerhart Hennen, Assistant*, for respondent.

HOUGHTON, J. — A distributor of tobacco products appeals a trial court order denying its motion for summary judgment and granting summary judgment in favor of the Department of Revenue. The trial court ruled that the statutory measure of the tobacco products tax is the price at which the distributor, an affiliate of the manufacturer, sells tobacco products rather than the price at which it

buys them from the manufacturer. We reverse and remand for further proceedings.

## I. FACTS

Appellant, the United States Tobacco Sales and Marketing Company Inc. (Tobacco Sales), is a Delaware corporation that buys, markets, and resells smokeless tobacco products in the State of Washington and elsewhere.[1] Most of Tobacco Sales' customers are wholesale distributors who resell the products to retailers. Tobacco Sales exclusively purchases the tobacco products it distributes from the United States Tobacco Manufacturing Company Inc. (Tobacco Manufacturing). Tobacco Sales is Tobacco Manufacturing's only domestic customer. Both Tobacco Sales and Tobacco Manufacturing are wholly-owned subsidiaries of the United States Tobacco Company (USTC).[2]

Washington State imposes an excise tax on the "sale, use, consumption, handling, or distribution of all tobacco products" in the state. RCW 82.26.020(1). "Tobacco products" are all types of chewing and smoking tobacco, snuff, and cigars, but not cigarettes. RCW 82.26.010(1). The tax is known as the Other Tobacco Products tax (OTP tax). It is measured by the "wholesale sales price" of tobacco products brought into the state.[3] RCW 82.26.020. The wholesale sales price is "the established price for which a manufacturer sells a tobacco product to a distributor, exclusive of any discount or other reduction." RCW 82.26-.010(7).

In addition to selling tobacco products to wholesalers, Tobacco Sales gives away sample products at promotional events, such as rodeos, auto races, and fishing tourna-

---

[1]Tobacco Sales' main product lines are Copenhagen and Skoal.

[2]USTC is in turn owned by UST Inc. Prior to 1990, USTC performed both the manufacturing and marketing functions. The company reorganized in 1990, creating Tobacco Manufacturing and Tobacco Sales as wholly-owned subsidiaries of USTC. Tobacco Sales employs approximately 600 full-time workers; Tobacco Manufacturing employs about 700.

[3]The tax rate is currently 74.9%. RCW 82.26.020-.025.

ments.[4] Until 1996, Tobacco Sales paid the OTP tax on the free samples it distributed in Washington. Tobacco Sales' Washington customers paid the OTP tax on products for resale.

In 1996, the Washington Department of Revenue (Department) audited Tobacco Sales. The auditor determined that Tobacco Sales was the taxable "distributor" under the statute and should have been paying the OTP tax on its sales as well as its samples. In the course of the audit, Tobacco Sales inquired whether its purchase price, rather than its selling price, was the correct measure of the tax under the statute. In September 1996, the auditor informed Tobacco Sales that its purchase price was, in fact, the correct measure; thus Tobacco Sales had been overpaying the tax. Tobacco Sales revised its pricing scheme based upon this information.

In December 1996, Tobacco Sales requested a refund of the OTP tax it had overpaid on its samples in 1992.[5] The Department denied the refund claim because the audit had not been finalized. In February 1997, in a summary of its final audit instructions, the Department advised Tobacco Sales that its original measure of the tax, its selling price, was the correct measure after all. The Department stated that although the correct tax measure was the manufacturer's selling price, "a sale by a manufacturer to a distributor who is an affiliate . . . is not used in establishing the manufacturer's selling price."[6] Therefore, the correct measure of the tax was Tobacco Sales' "selling price to distribu-

---

[4]Some of these promotional products are marked "SAMPLE," while others are unmarked. Although Tobacco Sales buys the marked samples from Tobacco Manufacturing at a discounted price, it acknowledges that it is liable for OTP tax on both marked and unmarked samples based upon its regular purchase price. *See* RCW 82.26.010(6) (" 'Sale' means any transfer, exchange, or barter, . . . [and] includes a gift by a person engaged in the business of selling tobacco products, for advertising . . . .").

[5]Prior tax years had closed under the statute of limitations. *See* RCW 82.32.060(1)-(3).

[6]In February 1997, at the Department's request, the Legislature considered a bill amending the OTP tax provisions. *See* HR 2202, 55th Leg. (Wash. 1997). The proposed bill stated that: "Sales between affiliates are not sales for the purpose of

tors who are not affiliated with you." According to the Department, this is what the Legislature meant by the phrase "established price."

In April 1997, Tobacco Sales filed a lawsuit against the Department requesting judgment in the amount of allegedly overpaid OTP tax for 1992. Tobacco Sales and the Department filed cross motions for summary judgment. On October 27, 1997, the trial court denied Tobacco Sales' motion and granted the Department's motion, finding that the price Tobacco Sales paid to Tobacco Manufacturing was a discounted price within the meaning of RCW 82.26.010(7). Tobacco Sales appeals.

## II. ANALYSIS

### A. Standard of Review

■ Tobacco Sales appeals both the summary judgment in favor of the Department and the denial of its motion for summary judgment. Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c). The appellate court reviews the trial court's decision de novo. *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998); *Young v. Estate of Snell*, 134 Wn.2d 267, 271, 948 P.2d 1291 (1997) (citing *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 394-95, 823 P.2d 499 (1992)). The court must construe the facts most favorably toward the nonmoving party. *Babcock v. State*, 116 Wn.2d 596, 599, 809 P.2d 143 (1991) (citing *Wendle v. Farrow*, 102 Wn.2d 380, 383, 686 P.2d 480 (1984)). Tobacco Sales has the burden of proving that the tax it paid was incorrect and establishing the correct amount. RCW 82.32.180.

### B. Wholesale Sales Price

■ At issue is the statutory definition of "wholesale sales price." Tobacco Sales argues that the price it pays

---

establishing distribution sales price." The Legislature, however, failed to enact the proposed changes.

Tobacco Manufacturing is the correct measure of the OTP tax. The Department contends that the tax should be based upon the wholesale value of tobacco products to a Washington wholesale purchaser (Tobacco Sales' selling price), because Tobacco Sales' purchase price is a "reduced price."

### 1. Statutory Definitions

■ The OTP tax is measured by the "wholesale sales price' of tobacco products. RCW 82.26.020. The "wholesale sales price" is "the established price for which a manufacturer sells a tobacco product to a distributor, exclusive of any discount or other reduction." RCW 82.26.010(7). A "manufacturer" is "a person who manufactures and sells tobacco products." RCW 86.26.010(2). A "distributor" includes: "any person engaged in the business of selling tobacco products in [Washington] who brings, or causes to be brought, into this state from without the state any tobacco products for sale."[7] RCW 82.26.010(3)(a). The statute makes no distinction between affiliated and nonaffiliated entities. It defines "person" as "any individual . . . firm, copartnership, joint venture, club, company, joint stock company . . . limited liability company, association, society, or any group of individuals acting as a unit."[8] RCW 82.04.030; *see also* WAC 458-20-203.[9] Under these defini-

---

[7]The full definition includes:

(a) any person engaged in the business of selling tobacco products in [Washington] who brings, or causes to be brought, into this state from without the state any tobacco products for sale, (b) any person who makes, manufactures, or fabricates tobacco products in this state for sale in this state, (c) any person engaged in the business of selling tobacco products without this state who ships or transports tobacco products to retailers in this state, to be sold by those retailers.

RCW 82.26.010(3).

[8]Although "person" is not defined in the OTP tax chapter, the term is used throughout the tax code and is defined in RCW 82.04.030.

[9]For Washington tax purposes, "Each separately organized corporation is a 'person' within the meaning of the law, notwithstanding its affiliation with or relation to any other corporation through stock ownership by a parent corporation by the same group of individuals." WAC 458-20-203.

tions, Tobacco Manufacturing is the manufacturer[10] and Tobacco Sales is the taxable distributor.[11]

2. Statutory Interpretation

Statutory interpretation is a question of law that the appellate court reviews de novo. *Monroe v. Soliz*, 132 Wn.2d 414, 418, 939 P.2d 205 (1997); *American Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 5, 802 P.2d 784 (1991). The court's fundamental duty is to ascertain and to carry out the Legislature's intent. *State v. Chester*, 133 Wn.2d 15, 21, 940 P.2d 1374 (1997). Legislative intent is derived primarily from the language of the statute. *State v. Michielli*, 132 Wn.2d 229, 237, 937 P.2d 587 (1997). If a statute is plain and unambiguous, its meaning must be derived solely from the statutory language. *Harmon v. Department of Soc. & Health Servs.*, 134 Wn.2d 523, 530, 951 P.2d 770 (1998) (citing *State v. Mollichi*, 132 Wn.2d 80, 87, 936 P.2d 408 (1997); *Marquis v. City of Spokane*, 130 Wn.2d 97, 107, 922 P.2d 43 (1996)). A statute is ambiguous if it is susceptible of two or more reasonable interpretations. *State v. Van Woerden*, 93 Wn. App. 110, 116, 967 P.2d 14 (1998) (citing *State v. Sunich*, 76 Wn. App. 202, 206, 884 P.2d 1 (1994)), *review denied*, 137 Wn.2d 1039 1999).

The OTP tax statute is not ambiguous; it uses plain language and defines key terms. Therefore, this court must determine the Legislature's intent from the words alone.[12]

---

[10]The Department argues that Tobacco Manufacturing does not meet the statutory definition of "manufacturer" because Tobacco Manufacturing relies upon USTC for telemarketing services and UST Inc. for certain administrative functions. But Tobacco Manufacturing pays an arm's-length price for these services. The Department presents no authority or argument to support its conclusion that manufacturers who contract with other entities for services are thereby excluded from the statutory definition of "manufacturer."

[11]After instructing Tobacco Sales to pay OTP tax on its sales as well as its samples in the course of the 1996 audit, the Department reversed its position. The Department now claims that Tobacco Sales is not the taxpayer with regard to products it sells to Washington wholesalers. But the Department agrees that Tobacco Sales is the "distributor" of the free samples it distributes in Washington, and only the tax paid on the samples is at issue in this case.

[12]The Department argues that its "longstanding interpretation" of the OTP tax measure is entitled to deference by the court. But courts defer to agency

*See Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 629, 869 P.2d 1034 (1994).

a. Discount or Other Reduction

■ In determining what a statute means, words should be ascribed their plain and ordinary meanings. *North Coast Air Servs., Ltd. v. Grumman Corp.*, 111 Wn.2d 315, 321, 759 P.2d 405 (1988). When a statute does not define a nontechnical word, the court may look to the dictionary for guidance. *State v. Myers*, 133 Wn.2d 26, 33, 941 P.2d 1102 (1997) (citing *State v. Pacheco*, 125 Wn.2d 150, 154, 882 P.2d 183 (1994)). According to Webster's dictionary, "discount" means "an abatement or reduction made from the gross amount or value of anything"; and "a reduction from a price made to a specific customer or class of customers." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 646 (1969). "Reduction" means "a decrease in size, amount, extent, or number." *Id.* at 1905. The meaning of these words relies upon comparison with an objective, fixed value, in this case, the manufacturer's "established price."

b. Established Price

Webster's dictionary defines "to establish" as "to make firm or stable: fix to prevent or check unsteadiness"; and "to place, install, or set up in a permanent or relatively enduring position." *Id.* at 778. A "fixed price" is "a uniform price for all customers." *Id.* at 861. Thus, a manufacturer's established price is a generally available, stable, fixed price,

---

interpretations only when statutory language is ambiguous. *Western Telepage, Inc. v. City of Tacoma*, 95 Wn. App. 140, 974 P.2d 1270, 1274 (1999) (citing *Simpson Inv. Co. v. Department of Revenue*, 92 Wn. App. 905, 913, 965 P.2d 654 (1998), *review granted*, 137 Wn.2d 1032 (1999); *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 627-28, 869 P.2d 1034 (1994)). Also, the Department submits no evidence that its current position amounts to a "longstanding interpretation." From the record, it appears that, until 1996, Tobacco Sales voluntarily paid the OTP tax based upon its selling price, without having been instructed by the Department to do so. *See Western Telepage*, 95 Wn. App. 146-47. Moreover, an administrative interpretation that conflicts with the statutory language is not entitled to deference. *Senate Republican Campaign Comm. v. Public Disclosure Comm'n*, 133 Wn.2d 229, 241, 943 P.2d 1358 (1997).

such as a list price or invoice price.[13] Because an "established price" is available to all customers, it reflects the fair market value of the products.[14] "Fair market value" is the amount a willing buyer would pay a seller who is willing but not obligated to sell. *Crystal Chalets Ass'n v. Pierce County*, 93 Wn. App. 70, 77, 966 P.2d 424 (1998) (citing *Duwamish Warehouse Co. v. Hoppe*, 102 Wn.2d 249, 254, 684 P.2d 703, 57 A.L.R.4TH 939 (1984)). In the case of affiliated companies, which, in effect, are obligated to buy and sell from each other, the "established price" must be based upon fair market value rather than the manufacturer's price to its affiliate.

c. Components of the Manufacturer's Price

The Department argues that because Tobacco Manufacturing and Tobacco Sales are affiliated, the "established price" should include both entities' costs and profits, i.e., manufacturing and marketing costs.[15] But neither the statute nor case law provides a basis for ignoring the entities' corporate structure. *See* RCW 82.04.030; WAC 458-20-203; *Rena-Ware Distribs. Inc. v. State*, 77 Wn.2d 514, 517-18, 463 P.2d 622 (1970) (wholly-owned subsidiaries are separate entities for purposes of taxing statutes); *Washington*

---

[13]Other state statutes similar to Washington's are in accordance with our interpretation. *See* ARK. CODE ANN. § 26-57-208(2)(B) (Michie) ("manufacturer's selling price" is "actual manufacturer's invoice price before discounts"); COLO. REV. STAT. § 39-28.5-101(3) (West) ("[m]anufacturer's list price" means "the invoice price . . . exclusive of any discount or other reduction"); 35 ILL. COMP. STAT. § 143/10-5 (West) (" 'Wholesale price' means the established list price for which a manufacturer sells tobacco products . . . [or] the manufacturer's invoice price . . . to unaffiliated distributors . . . ."); OHIO REV. CODE ANN. § 5743.01 (K) (Anderson) (" 'Wholesale price' means the invoice price . . . to unaffiliated distributors").

[14]*Cf.* CONN. GEN. STAT. § 12-330a (" '[W]holesale sales price' [of tobacco products is] the price set for such products or, if no price has been set, the wholesale value of such products . . . ."); *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 405, 410 (1992)("established price," as used in Federal Acquisition Regulation § 52.216-2, means "a price that . . . is an established catalog or market price for a commercial item sold in substantial quantities to the general public."), *dismissed by* No. 94-5068, 1994 WL 745571 (Fed. Cir. Apr. 8, 1994).

[15]Prior to the 1990 reorganization, USTC both manufactured and marketed its tobacco products. The tax base at that time was therefore substantially larger than after the reorganization.

*Sav-Mor Oil Co. v. Tax Comm'n*, 58 Wn.2d 518, 364 P.2d 440 (1961) (transactions between oil company and affiliated distributor are treated as sales between separate corporations for tax purposes).

The statute imposes the tax upon the value of a manufacturer's products, measured at the time the manufacturer sells the products. This price will reflect the quality, quantity, packaging, and trademark value of the products as provided by the manufacturer. At a minimum, this price must include the costs and profits associated with manufacturing and sales, because those functions are mandated by the statutory definition of "manufacturer." RCW 82.26-.010(2). But it need not include value that is added to the products after the manufacturer sells them. Under this definition, the OTP tax will be higher on products that are extensively marketed by their manufacturer than on products that a manufacturer sells generically. But the statute permits this disparity, and the court may not alter the statutory language.[16] *See King County v. City of Seattle*, 70 Wn.2d 988, 991, 425 P.2d 887 (1967) (courts are not to read into statutes matters that are not there, nor modify statutes by construction).

C. Summary Judgment

1. Order Granting Summary Judgment

■ Before the court below, both parties argued that disposition of their summary judgment motions entailed resolution of a legal issue, the statutory measure of the OTP tax. The trial court agreed, basing its ruling that Tobacco Manufacturing's price is "discounted" upon its interpretation of the statutory definition as excluding prices between affiliates. The trial court's analysis was in error. Whether a price is discounted is a factual determination and is evaluated without regard to the purchaser's corporate affiliation. As discussed above, the statutory measure of the OTP

---

[16]Other states have avoided this problem by taxing tobacco products by weight or item. *See, e.g.*, ALA. CODE § 40-25-2; ARIZ. REV. STAT. § 42-3052(6); *see also* FLA. STAT. ch. 210.30 (tobacco products tax imposed upon consumers); N.J. REV. STAT. § 54:40B-3 (tax imposed upon retailers or consumers).

942

tax is the manufacturer's list or invoice price; i.e., the fair market value of the products. Here, because Tobacco Manufacturing sells exclusively to an affiliate, its selling price does not necessarily reflect fair market value. Therefore to determine whether Tobacco Manufacturing's price is discounted, the trier of fact must compare Tobacco Manufacturing's price with the fair market value of its products.

In support of its position that its purchase price from Tobacco Manufacturing is fair market value, Tobacco Sales submitted a transfer pricing study performed by an accounting firm, Ernst & Young, in 1995. The study was commissioned to determine, for federal tax purposes, arm's-length prices for products and services transferred between various UST Inc. subsidiaries.[17] The study concluded that Tobacco Manufacturing's price is an arm's-length price under federal law.

The Department failed to submit any evidence of fair market value or pricing comparisons. Rather, the Department contended that a transfer price between affiliated companies cannot represent a market price. It attacked the Ernst & Young study as irrelevant because it was performed for federal income tax purposes and because the arm's-length price was derived from a formula rather than set by market forces.[18] But the Department failed to identify in what respect the federal arm's-length-price standard differs from fair market value. The Department argued that a "common sense" construction of the statute is that the

[17]The study adhered to the regulations promulgated by the Internal Revenue Service pursuant to IRC § 482, which governs intercompany transfers. See 26 C.F.R. § 1.482-1. The regulations require that arm's-length prices be charged for such transactions. 26 C.F.R. § 1.482-1(b). A price is arm's length if "the results of the transaction are consistent with the results that would have been realized if [unaffiliated] taxpayers had engaged in the same transaction under the same circumstances." 26 C.F.R. § 1.482-1(b).

[18]The transfer pricing regulations set forth specific methods for calculating the most accurate arm's-length-price for various transactions. See 26 C.F.R. § 1.482-1 to -7. Because Ernst & Young concluded that there are no tobacco products manufacturers similar to Tobacco Manufacturing, it relied on the alternate methods provided in the regulations. See 26 C.F.R. § 1.482-3 to -7.

"wholesale sales price" is the wholesale price paid by a nonaffiliated Washington customer.

The Department's position is contrary to the statutory language, which refers to the manufacturer's price. Tobacco Sales is not a manufacturer. And the law does not permit the Department to disregard Tobacco Sales' and Tobacco Manufacturing's separate corporate identities and treat them as one entity for tax purposes.[19] That a pricing study is undertaken in the context of federal income tax does not preclude its relevance in determining fair market value for Washington tax purposes. Likewise, that a profit-sharing formula is used or that a transaction occurs between affiliated entities is not determinative of whether a transfer price is a market price. The pertinent inquiry is what *is* the fair market value, not how it is determined, for what purpose, or by whom.

The trial court determined that Tobacco Sales' purchase price is a reduced price because: Tobacco Manufacturing's price is set using a calculation that takes each entity's profit margins into account, and the price is set after the transaction between Tobacco Manufacturing and Tobacco Sales;[20] the Ernst & Young study is not relevant because it deals with federal income tax; and, the Department's interpretation is entitled to deference. These factors do not resolve the question of what is the fair market value of Tobacco Manufacturing's products. Therefore, summary judgment in favor of the Department was not appropriate.

2. Order Denying Summary Judgment

Tobacco Sales also challenges the denial of its motion for summary judgment. Because disposition of this case entails

---

[19]Corporate forms may be set aside only in cases of fraud. *Rena-Ware Distributors, Inc.*, 77 Wn.2d at 518 (citing *Associated Oil Co. v. Seiberling Rubber Co.*, 172 Wash. 204, 19 P.2d 940 (1933)). This safeguard will prevent the "[t]ax anarchy" the Department suggests would result from "allow[ing Tobacco Sales] to set its own tax bill." Furthermore, if Tobacco Manufacturing were to sell to Tobacco Sales at below-market rates, the Department could contest the sale price as not meeting the definition of "established price" under the statute.

[20]The price is actually set at the beginning of each year.

a disputed factual issue, the trial court was correct in denying the motion.

The order granting summary judgment in favor of the Department is reversed, the order denying summary judgment in favor of Tobacco Sales is affirmed, and the case is remanded for further proceedings consistent with this opinion.

ARMSTRONG, A.C.J., and HUNT, J., concur.

Reconsideration denied October 22, 1999.