[No. 30434-1-II.   Division Two.   July 19, 2005.]

UNITED STATES TOBACCO SALES AND MARKETING COMPANY INC., *Respondent*, v. THE DEPARTMENT OF REVENUE, *Appellant*.

*Robert M. McKenna*, *Attorney General*, and *David M. Hankins*, *Assistant*, for appellant.

*William C. Severson*, for respondent.

¶1 QUINN-BRINTNALL, C.J. — United States Tobacco Sales and Marketing Company Inc. (Tobacco Sales), and the Department of Revenue (DOR) each appeal a superior court ruling determining the amount of a refund owed Tobacco Sales for overpaid excise tax. Because the superior court's ruling is not supported by substantial evidence, we must reverse and remand for further proceedings.

## FACTS

¶2 This is the second appeal in this matter. *See U.S. Tobacco Sales & Mktg. Co. v. Dep't of Revenue*, 96 Wn. App. 932, 982 P.2d 652 (1999) (*U.S. Tobacco* I). The facts of the first appeal were aptly set out in *U.S. Tobacco* I, but to the extent they are relevant here, we repeat them.

¶3 Washington's other tobacco products (OTP) tax imposes an excise tax on the "sale, use, consumption, handling, or distribution of all tobacco products" in the state. Former RCW 82.26.020(1) (1993).[1] The tax is measured by the "wholesale sales price" of OTP brought into the state. Former RCW 82.26.020. The wholesale sales price is "the established price for which a manufacturer sells a tobacco product to a distributor, exclusive of any discount or other reduction." Former RCW 82.26.010(7) (1995).

¶4 Tobacco Sales is a corporation that buys, markets, and resells smokeless tobacco products primarily to wholesale distributors in Washington and elsewhere. Tobacco

---

[1] "Tobacco products" include all types of chewing and smoking tobacco, snuff, and cigars, but does not include cigarettes. Former RCW 82.26.010(1) (1995).

Sales exclusively purchases the tobacco products it distributes from the United States Tobacco Manufacturing Company, Inc. (Tobacco Manufacturing). Tobacco Sales is Tobacco Manufacturing's only domestic customer. Both Tobacco Sales and Tobacco Manufacturing are wholly-owned subsidiaries of the United States Tobacco Company (USTC).

¶5 In addition to selling tobacco products to wholesalers, Tobacco Sales gives away sample products at promotional events. Until 1996, Tobacco Sales paid the OTP tax on the free samples it distributed in Washington. Tobacco Sales measured the OTP tax based on the price Tobacco Sales sold other comparable OTP to wholesale distributors. Tobacco Sales's Washington customers paid the OTP tax on products for resale.

¶6 DOR audited Tobacco Sales in 1996, and determined that Tobacco Sales, not its wholesale distributor customers, should have been paying the OTP tax. Tobacco Sales inquired during the audit whether its purchase price paid to Tobacco Manufacturing, rather than its selling price, was the correct measure of the tax under the statute. After DOR informed Tobacco Sales that its purchase price was the correct measure, Tobacco Sales requested a refund of the OTP tax it had overpaid on the promotional samples. DOR then took a new position that although the correct tax measure was the manufacturer's selling price, "a sale by a manufacturer to a distributor who is an affiliate . . . is not used in establishing the manufacturer's selling price." *U.S. Tobacco* I, 96 Wn. App. at 935. Therefore, the correct measure of the tax was Tobacco Sales's selling price to wholesale distributor customers.

¶7 In April 1997, Tobacco Sales sued DOR to recover the amount of allegedly overpaid OTP tax for 1992.[2] In 1992, Tobacco Sales purchased OTP from Tobacco Manufacturing for $.625 per can and sold it to wholesale distributors for

---

[2] Prior tax years had closed under the statute of limitations. Former RCW 82.32.060(3) (1992). The record does not indicate why Tobacco Sales did not seek a refund for OTP tax paid in 1993 through 1996.

$1.43 per can. On cross-motions for summary judgment, the superior court found that the price Tobacco Sales paid Tobacco Manufacturing was a "discounted" price that did not reflect the "wholesale sales price" within the meaning of the OTP taxing statute. The superior court concluded that because the two companies were subsidiaries, the $1.43-per-can price paid by Tobacco Sales's customers was the wholesale sales price; thus, Tobacco Sales was not entitled to a refund. Tobacco Sales appealed.

¶8 On appeal, we rejected DOR's argument that because Tobacco Manufacturing and Tobacco Sales were affiliated, they should be treated as one entity and the wholesale sales price should include both entities' costs and profits:

> The [OTP tax] statute makes no distinction between affiliated and nonaffiliated entities. . . . Under the[ ] [statute], Tobacco Manufacturing is the manufacturer and Tobacco Sales is the taxable distributor.
>
> . . . [N]either the statute nor case law provides a basis for ignoring the entities' corporate structure . . . .
>
> The statute imposes the tax upon the value of a manufacturer's products, measured at the time the manufacturer sells the products. This price will reflect the quality, quantity, packaging, and trademark value of the products as provided by the manufacturer. At a minimum, this price must include the costs and profits associated with manufacturing and sales, because those functions are mandated by the statutory definition of "manufacturer." RCW 82.26.010(2). But it need not include value that is added to the products after the manufacturer sells them. Under this definition, the OTP tax will be higher on products that are extensively marketed by their manufacturer than on products that a manufacturer sells generically. But the statute permits this disparity, and the court may not alter the statutory language.

*U.S. Tobacco I*, 96 Wn. App. at 937-38, 940-41 (footnotes omitted). We therefore reversed the trial court's grant of summary judgment to DOR:

> The trial court . . . bas[ed] its ruling that Tobacco Manufacturing's price is "discounted" upon its interpretation of the statu-

tory definition as excluding prices between affiliates. The trial court's analysis was in error. Whether a price is discounted is a factual determination and is evaluated without regard to the purchaser's corporate affiliation.

. . . [T]he statutory measure of the OTP tax is the manufacturer's list or invoice price; i.e., the fair market value of the products. Here, because Tobacco Manufacturing sells exclusively to an affiliate, its selling price does not necessarily reflect fair market value. Therefore to determine whether Tobacco Manufacturing's price is discounted, the trier of fact must compare Tobacco Manufacturing's price with the fair market value of its products.

*U.S. Tobacco* I, 96 Wn. App. at 941-42.

¶9 On remand, a bench trial was held to determine the fair market value of the OTP sold by Tobacco Manufacturing in 1992. Tobacco Sales presented the findings of two studies completed in 2000: a transfer pricing study performed by an accounting firm, Ernst & Young, and an analysis performed by an appraisal firm, Willamette Management Associates. Both studies concluded that the 1992 fair market value for Tobacco Manufacturing's OTP was between $.68 and $.72 per can.

¶10 DOR did not present any evidence as to the fair market value of OTP sold by Tobacco Manufacturing. Instead, it maintained its position, a position which this court rejected in the first appeal, that the correct measure of the OTP tax should be Tobacco Sales's selling price. It supported this position with testimony by a DOR economist and real property appraiser. But DOR's appraiser also testified that the fair market value of the OTP at the time it was sold by Tobacco Manufacturing, as determined by Tobacco Sales's experts, was correct:

Q. And the conclusions Ernst & Young and Willamette Management came up with indicated that that was a fair market value; is that correct?

A. That's correct.

Q. And you're not disputing that that is a fair market value *at that level of trade*, are you?

A. No, I'm not.

2 Report of Proceedings (RP) at 360-61 (emphasis added).

¶11 The trial court concluded at the close of testimony that the appropriate fair market value for Tobacco Manufacturing's 1992 OTP was $.82 per can. In rejecting Tobacco Sales's position, the court stated that although "no one really quarreled" with the $.68 to $.72 price, "common sense" suggested a higher price. 3 RP at 453. Both parties appeal.

## ANALYSIS

¶12 Each party assigns error in this appeal to the trial court's determination that the 1992 fair market value of OTP sold by Tobacco Manufacturing was $.82 per can. Because this determination is a factual finding, substantial evidence must support it. *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990). Substantial evidence does not support the trial court's finding, but in order to fully understand how the court came to enter the finding that it did, we discuss the positions of DOR and Tobacco Sales.

¶13 In *U.S. Tobacco I*, we instructed the parties and the trial court to compare Tobacco Manufacturing's 1992 invoice price of $.625 per can with the fair market value of its OTP because the invoice price did not "necessarily" reflect the price which would be paid between unaffiliated entities. 96 Wn. App. at 942. Tobacco Sales's experts testified that there are several ways to measure the fair market value of goods which have been sold only between affiliated entities. These measures have largely been codified by the Internal Revenue Service (IRS) for purposes of calculating the free market "arm's-length" price of intercompany transfers. *See* 26 C.F.R. § 1.482-1. Only two of these measures were presented below: the "resale price" method and the "residual profit split" method.

¶14 DOR's position that $1.43 was the fair market value of OTP sold by Tobacco Manufacturing was based on the resale price method.[3] This method "can be used to determine the arm's-length price to be paid by the purchaser entity in the subject intercompany transaction when that purchaser, in turn, resells the subject tangible asset to unrelated parties." Robert F. Reilly & Melvin Rodriguez, *Excise Tax and Inventory: IRC Section 482 Transfer Price Rules May Provide a Reasonable Valuation Approach*, J. MULTISTATE TAX'N, May 2004, at 18, 24 (*"Excise Tax and Inventory"*) (citing 26 C.F.R. § 1.482-3(c)(1)). But this method is appropriate only in cases involving the purchase and resale of tangible goods in which the reseller (here Tobacco Sales) has not added *substantial* value to the goods. *Bausch & Lomb Inc. v. Comm'r*, 92 T.C. 525, 586 (1989), *aff'd*, 933 F.2d 1084 (2nd Cir. 1991); *Excise Tax and Inventory*, at 24.

¶15 DOR presented no evidence that the OTP sold by Tobacco Manufacturing did not gain value while owned by Tobacco Sales.[4] Nor has DOR ever demonstrated that Tobacco Sales was a shell entity through which the OTP was funneled to evade taxes. As set forth in the studies conducted by Tobacco Sales's experts, Tobacco Sales increased the value of the OTP through an array of activities including sales, marketing, promotions, product sampling,

---

[3] DOR continues to maintain that the fair market value of goods can never be determined when such goods are sold only between affiliated companies. But we rejected this argument in *U.S. Tobacco* I; DOR has failed to present any evidence to support this claim; and the argument is rebutted by the IRS's codification of formulas specifically designed to determine the "arm's-length" price of intercompany transfers. *See* 26 C.F.R. § 1.482-1; *see also U.S. Tobacco* I, 96 Wn. App. at 942 ("[T]he Department failed to identify in what respect the federal arm's-length-price standard differs from fair market value.").

[4] It is in this respect that DOR's citation to *Creme Manufacturing Co. v. United States*, 492 F.2d 515 (5th Cir. 1974), fails. In that case, a manufacturing corporation sold taxable fishing lures to its related selling corporation for 25 percent of list price and the selling corporation resold the lures to unrelated wholesale distributors for 40 percent of list price. *Creme Mfg.*, 492 F.2d at 518. Because there was no evidence that the lures gained value between sale to the selling corporation and sale to the unrelated distributors, the Fifth Circuit affirmed the IRS's decision to calculate an excise tax based on the higher sales price. *Creme Mfg.*, 492 F.2d at 521-22.

and distribution. Thus, we reiterate that it is not appropriate to measure the value of OTP sold by Tobacco Manufacturing by the price Tobacco Sales sold to independent distributors.[5] The trial court properly rejected DOR's position that the $1.43 price was the fair market value of OTP sold by Tobacco Manufacturing.

¶16 For its part, Tobacco Sales's $.68- to $.72-per-can fair market value calculation was based upon the residual profit split method. This method "determines a tangible asset's arm's-length transfer price based on the relative value of each related party's contribution to the combined profit or loss in a particular controlled transaction or set or controlled transactions." *Excise Tax and Inventory*, at 25 (citing 26 C.F.R. § 1.482-6(b)). Under this method:

> [T]he controlled taxpayers' combined operating profit from the relevant business activity is allocated first to routine functions, services, and tangible and intangible assets. Any remaining unallocated profit (i.e., profit attributable to the controlled group's valuable intangible property, where similar property is not owned by the uncontrolled taxpayers) is allocated based on the related parties' relative contributions of such intangibles.

*Excise Tax and Inventory*, at 25 (citing 26 C.F.R. § 1.482-6(c)(3)(i)). The residual profit split method is best explained by an example: If Manufacturer sells to Distributor a widget for $1 (which includes Manufacturer's costs and set operating profit), and Distributor sells the widget for $3 (which includes $1 for Distributor's costs and set operating profit), there is $1 of residual profit. The residual profit split method allocates that $1 based on Manufacturer and Dis-

---

[5] *See* UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE 2005 (USPAP), Standard Rule 7-3(b) cmt.:

> The appraiser must recognize that there are distinct levels of trade and each may generate its own data. For example, a property may have a different value at a wholesale level of trade, a retail level of trade, or under various auction conditions. Therefore, the appraiser must analyze the subject property within the correct market context.

*Available at* http://commerce.appraisalfoundation.org/html/USPAP2005/std7.htm. Washington has adopted the USPAP as the standard of practice governing real estate appraisal activities. WAC 308-125-200(1).

tributor's contribution of intangible assets to the entire transaction. Thus, for example, if Manufacturer contributes 40 percent of the intangible assets while Distributor contributes the rest, the $1 of residual profit would be split accordingly.

¶17 In this case, Tobacco Sales's experts each testified that the appropriate allocation of the residual profit was 24 percent for Tobacco Manufacturing and 76 percent for Tobacco Sales. DOR did not dispute the allocation, which was based on Tobacco Manufacturing's "ownership of trademarks and trade names" and Tobacco Sales's performance of "brand management and brand marketing." 1 RP at 192. The allocation captured the expenditures by each company "done to promote those sort of nonroutine intangibles." 1 RP at 126. The fair market value under this residual profit split method was $.68 to $.72 per can.

¶18 In rejecting the $.68 to $.72-per-can price, the trial court noted that "no one really quarreled with the . . . 76/24 split," but then concluded that "common sense indicates that if there were a nonaffiliated distributor that [Tobacco Manufacturing] was going to sell to, they would not say, well, here, we'll take 24 percent of the profit and you can have 76 percent." 3 RP at 453. The court then assigned a residual profit rate of 40 percent for Tobacco Manufacturing and 60 percent for Tobacco Sales. This rate resulted in a fair market value of $.81 to $.84 per can, from which the court selected $.82. But no evidence supports the trial court's 40/60 allocation rate in this context.

¶19 The 40/60 rate was USTC's projection, at the beginning of 1992, of how 1992 total gross profits in 1992 would be allocated between Tobacco Manufacturing and Tobacco Sales. This projection was made in order to set each company's 1992 budget, which in turn set the internal transfer prices between the two subsidiaries. These transfer prices, fixed by the 40/60 rate, included the $.625-per-can price actually used between Tobacco Sales and Tobacco Manufacturing. But as discussed in *U.S. Tobacco* I, the internal transfer price between the two subsidiaries does

not establish fair market value, i.e., what a willing buyer would pay a willing seller in an arm's-length transaction in a free market. In testimony not disputed by DOR, Tobacco Sales's expert explained that the 40/60 rate was the result of an "internal transfer pricing formula"[6] which had no bearing on the residual profit distribution or fair market value of Tobacco Manufacturing's 1992 OTP:

> [The 24/76 rate is] a very specific analysis to one specific slice of profits. Either level of profit has been allocated separately, one based on . . . a return on assets for [Tobacco] Manufacturing or return on sales for [Tobacco Sales]. A second layer is based on a return on actual expenses, which are different for [Tobacco Sales] than for [Tobacco] Manufacturing, obviously, it's only this residual level after most of the pizza pie has been consumed there's a slice left, and we have to allocate that last slice of profits and that was based on a relative expense, a relative cost of certain intangible assets creating creation expenses. But only that slice should be allocated 24/76 because that's the right way to allocate that slice. That slice shouldn't be allocated 40/60, just like all of the profits shouldn't be allocated 24/76.

2 RP at 257.

¶20 The trial court's basis for discarding the 24/76 split—i.e., that a "nonaffiliated distributor . . . would not say . . . we'll take 24 percent of the profit and you can have 76 percent"[7]—misconstrues the residual profit split method. The residual profit split method seeks to allocate residual profit only; it assumes that each company has already allocated for itself an operating profit. The decision to split residual profit 24/76 does not suggest the same result for overall profits. Because there was no basis for the trial court to adopt a 40/60 residual profit split, the trial court's finding of $.82 as the fair market value is not supported by substantial evidence.

¶21 Each party advocates that, on remand, we instruct the trial court to set fair market value at its respective

---

[6] 2 RP at 240.

[7] 3 RP at 453.

amount. But as already discussed, DOR's $1.43 per can position is wholly unsupported. And we are not convinced that the $.68 to $.72 range championed by Tobacco Sales truly reflects the fair market value of OTP sold by Tobacco Manufacturing in 1992. The lengthy Willamette Management Associates and Ernst & Young studies both state the conclusion that the $.68 to $.72 range was the appropriate measure of fair market value. And DOR's appraiser did not dispute that this range was the correct "fair market value at that level of trade." 2 RP at 360-61. But certain language from those studies and the testimony from which they were presented suggest that the qualifier "level of trade" included the affiliation between Tobacco Manufacturing and Tobacco Sales.[8] As such, the court's market price would not reflect the price of OTP sold between unaffiliated entities. Moreover, although the Ernst & Young study in this appeal came to the conclusion that the 1992 fair market value was between $.68 and $.72 per can, the Ernst & Young study in the first appeal concluded that the $.625 price was an appropriate arm's-length price for that same year. *U.S. Tobacco I*, 96 Wn. App. at 942. Neither party has clarified this disparity.[9]

¶22 The record does not contain substantial evidence supporting the trial court's finding that the fair market value of OTP sold in 1992 by Tobacco Manufacturing was $.82 per can. The parties are directed to provide evidence on

[8] *See, e.g.*, 2 RP at 228-29:

Q. Let's take my hypothetical though, Mr. Reilly. Isn't it true that—let's say Wal-Mart came in and said we're going—for all our stores have our own internal unit, we don't care about you nationally, [Tobacco] Manufacturing, but we're going to push your products in our stores and we're a big customer. Isn't it true that if [Tobacco] Manufacturing did sell to them that they would charge them a higher price than what they charge to [Tobacco Sales]?

A. Well, would they, I just don't think it would ever be possible because that's just not a hypothetical that I could see occurring on the planet Earth, given the economics, the principles of economics that have, you know, been around since Malthus and Ricardo and for the last several hundred years.

[9] We also note that while throughout these proceedings it appeared undisputed that the 1992 internal invoice price was $.625 per can, the Willamette Management Study concluded that the invoice price was actually $.73 per can that year. While the invoice price does not necessarily reflect fair market and, therefore, this discrepancy may be irrelevant, it reflects the need for further clarification below.

remand of the price a *completely unaffiliated entity* would have had to pay to purchase OTP from Tobacco Manufacturing in 1992.

¶23 Reversed and remanded.

HOUGHTON and BRIDGEWATER, JJ., concur.

Reconsideration denied September 1, 2005.

Review granted at 157 Wn.2d 1001 (2006).