[No. 34883-7-II.   Division Two.   June 19, 2007.]

ECHO BAY COMMUNITY ASSOCIATION, *Appellant*, v. THE DEPARTMENT OF NATURAL RESOURCES ET AL., *Respondents*.

---

322

*David S. Mann* (of *Gendler & Mann LLP*), for appellant.

*Robert M. McKenna, Attorney General,* and *Terence Pruit, Assistant; Thomas H. Oldfield* (of *Oldfield & Helsdon PLLC*), for respondents.

¶1  BRIDGEWATER, J. — Echo Bay Community Association appeals from a superior court judgment that the Department of Natural Resources (DNR) may lease bedlands to someone who is not the owner of abutting shorelands or tidelands, i.e., a commercial herring operation. We hold that DNR may lease to a nonabutting person for aquacultural purposes and that herring net pens constitute aquaculture "processing," even though the herring are only held without feeding in order to prepare them for bait. We affirm.

## FACTS

¶2 In September 2005, DNR leased bedlands,[1] located in Echo Bay off Fox Island in Pierce County, to F/V Puget LLC, which planned to use the bedlands for herring net pens. F/V Puget's operation plan called for catching herring and depositing the fish into the net pens and holding them for two weeks without food. By withholding food from the herring in the pen, F/V Puget empties the herring's digestive tract of bacteria, making the fish easier to freeze, preserve, and sell as bait. The process also makes the fish more marketable because they are able to better stay on fish hooks. F/V Puget planned to preserve and package the fish at an upland location before sale.

¶3 From 1975 until August 2002, the bedlands that F/V Puget leased were occupied by larger delayed-salmon-release pens operated by the Department of Fish and Wildlife (DFW). When the DFW decided to abandon the salmon pens, F/V Puget began gathering permits to allow it to use the DFW's existing concrete anchors to build and operate herring pens. F/V Puget's pens would occupy a substantially smaller footprint (40 percent smaller) than the DFW's salmon pens.

¶4 Before DNR would lease the bedlands to F/V Puget, F/V Puget had to obtain a shoreline substantial development permit from Pierce County. Pierce County granted the shoreline permit in August 2005, subject to several conditions. During this process, Pierce County determined that herring net pens were an "aquaculture" use for purposes of the Pierce County Code.

¶5 Historically, DNR has considered herring pens to be aquaculture. In DNR's 1999 aquaculture handbook, it notes that it has several herring pen leases on public aquatic land. Its March 2000 resource-policy-implementation manual defined "aquaculture" to include "raising fin fish in

---

[1] Bedlands are "lands lying waterward . . . and below the . . . extreme low tide mark in navigable tidal waters." RCW 79.105.060(2).

floating net pens." Administrative Record (AR) at 697. And in DNR's July 2004 aquatic resources-program-activity summary, DNR defined "primary aquaculture" to include net pen aquaculture, including salmon aquaculture and herring operations. In 2004, DNR had five leases covering 4.3 acres dedicated to herring production.

¶6 In October 2005, a month after DNR leased the Echo Bay bedlands to F/V Puget, the Echo Bay Community Association, whose members owned tidelands adjacent to Echo Bay, filed an appeal under RCW 79.02.030[2] challenging the lease's validity. Echo Bay argued that DNR had authority to lease bedlands to only adjacent shoreland and tideland owners. In addition, Echo Bay argued that herring pens were not aquaculture.

¶7 Following RCW 79.02.030's provisions, the superior court conducted a trial de novo based on the pleading and papers DNR certified as the applicable record. In a letter to counsel, the superior court interpreted the applicable statutes to give DNR authority to lease bedlands to any person for aquaculture purposes. The superior court also interpreted the statutory term "aquaculture" to include herring net pens. Clerk's Papers at 77-79.

¶8 Echo Bay filed this timely appeal, asking us to interpret the relevant statutes and to reverse the superior court.

## ANALYSIS

### I. DNR's Authority

¶9 Relying on RCW 79.130.010, which is titled "Lease of beds of navigable waters," and provides "the department may lease [bedlands] to the abutting tidelands or shorelands owner or lessee," Echo Bay argues that DNR

---

[2] RCW 79.02.030 provides in relevant part: "Any applicant to purchase, or lease, any public lands of the state . . . and any person whose property rights or interests will be affected by such sale or lease, feeling aggrieved by any order or decision of the board, or the commissioner, concerning the same, may appeal therefrom to the superior court of the county in which such lands or materials are situated."

has authority to lease bedlands only to abutting tidelands or shoreland owners or lessees. Echo Bay asks this court to read RCW 79.130.010 as imposing a "blanket ban on leasing navigable bedlands to non-adjacent tideland owners or lessees."[3] Br. of Appellant at 13.

¶10  DNR concedes that F/V Puget does not own or lease abutting tidelands or shorelands but argues that the lease is valid under RCW 79.135.110, which is titled "Leasing beds of tidal waters for shellfish cultivation or other aquaculture use." Read independently, this statute provides authority to lease bedlands for aquaculture purposes to any person, not just abutting tideland and shoreland owners and lessees. Thus, this case presents us with a question of statutory construction: Does RCW 79.135.110 authorize leases to persons who do not own or lease abutting shorelands or tidelands?

¶11  We review issues of statutory interpretation de novo. *City of Pasco v. Pub. Employment Relations Comm'n*, 119 Wn.2d 504, 507, 833 P.2d 381 (1992). Although our review is de novo, we give substantial weight to an agency's interpretation of statutes and regulations that it implements and enforces. *Impecoven v. Dep't of Revenue*, 120 Wn.2d 357, 363, 841 P.2d 752 (1992); *Cobra Roofing Serv., Inc. v. Dep't of Labor & Indus.*, 122 Wn. App. 402, 409, 97 P.3d 17 (2004), *aff'd*, 157 Wn.2d 90, 135 P.3d 913 (2006).

¶12  In interpreting a statute, our fundamental duty is to ascertain and implement the legislature's intent. *U.S. Tobacco Sales & Mktg. Co. v. Dep't of Revenue*, 96 Wn. App. 932, 938, 982 P.2d 652 (1999). We must give meaning to every word and interpret the statute as written. *Enter. Leasing, Inc. v. City of Tacoma*, 139 Wn.2d 546, 552, 988 P.2d 961 (1999). Our first step is to look at the plain meaning of the statutory terms, although we may also look

---

[3] Echo Bay interchanges the terms "adjacent" and "abutting" in discussing the authority of DNR. "Adjacent" tideland owners are not relevant to our discussion; the statute referred to by Echo Bay refers only to "abutting" owners; expanding the statute to adjacent owners would require a statutory change and would make the statutory class meaningless.

at related statutes that might disclose legislative intent about the specific provision in question. *Thurston County v. Cooper Point Ass'n*, 148 Wn.2d 1, 12, 57 P.3d 1156 (2002). Our goal is to avoid interpreting statutes to create conflicts between different provisions so that we achieve a harmonious statutory scheme. *Lee Cook Trucking & Logging v. Dep't of Labor & Indus.*, 109 Wn. App. 471, 481, 36 P.3d 558 (2001). If two provisions conflict, we give preference to the more specific statute. *Bowles v. Dep't of Ret. Sys.*, 121 Wn.2d 52, 78, 847 P.2d 440 (1993).

■■ ¶13 RCW 79.135.110 authorizes DNR to lease bedlands for other aquaculture uses:

(1) The beds of all navigable tidal waters in the state lying below extreme low tide . . . shall be subject to lease for the purposes of planting and cultivating oyster beds, or for the purpose of cultivating clams or other edible shellfish, or for other aquaculture use. . . .

(2) Nothing in this section shall prevent any person from leasing more than one parcel, as offered by the department.

The statute's plain language confers broad authority to allow the State to lease tidal bedlands for aquaculture uses. The only restriction is that the lease must be for an aquaculture use. This statute does not limit who may apply for and receive such leases.

¶14 Echo Bay points out that the mandatory language in subsection (1) does not indicate to whom the State may lease these tidal bedlands for the purpose of aquaculture. Echo Bay asks us to read this silence as a meaningful one and impose some restriction on who may get such a lease. But subsection (2) indicates that "any person" is eligible to lease bedlands, as any person may lease more than one tidal bedland parcel. RCW 79.135.110(2). If any person may have more than one parcel, then it is logical that any person is eligible to lease one parcel, and there is no restriction, i.e., being an abutting owner or lessee. Thus, considered as a whole, RCW 79.135.110 allows any person to apply to obtain such a lease. Additionally, RCW 79.135.120, that

provides for the application for leasing, also refers to "[a]ny person."

¶15 Echo Bay contends that if we interpret RCW 79-.135.110(1) to allow DNR to lease tidal bedlands to any person who will use the bedlands for an aquaculture use, the statute would conflict with RCW 79.130.010. That statute allows DNR to lease any navigable bedlands (tidal and other) to abutting shoreline and tideland owners and lessees. RCW 79.130.010. If RCW 79.135.110 allows anyone to lease tidal bedlands, Echo Bay argues, RCW 79.130.010's restriction to abutting owners and lessees would be meaningless. Echo Bay is incorrect.

¶16 First, there is no inherent conflict between these two statutes as written. The two statutes cover different lands and allow for different sorts of leases. Nothing in RCW 79-.130.010 imposes a ban on leasing bedlands to nonabutting landowners. The statute is a positive grant of authority, allowing bedland leases to abutting landowners, and including tidal, river, and lake bedlands. RCW 79.130.010(1). The statute does not restrict the purposes for which abutting owners can lease the bedlands. As the State points out, an abutting landowner might lease bedlands under this statute for mooring vessels, placing a swim raft or dock, establishing a marina or boat repair facility, or for any number of other purposes. RCW 79.135.110(1), on the other hand, grants DNR authority to lease only tidal bedlands and only for shellfish cultivation and other aquaculture uses. Thus, one statute allows leases of any bedlands for any purpose to abutting shoreland and tideland owners, while the other allows leases of tidal bedlands to any person only for the purpose of shellfish cultivation and aquaculture.

¶17 Since these two statutes are independent grants of authority, the State may lease under either statute. At most, it is possible that the two statutes might overlap if an abutting landowner wanted to lease tidal bedlands for aquaculture. But that both statutes authorize DNR to lease land in a particular situation does not mean that the two

statutes conflict. It is reasonable to authorize commercial aquaculture in a separate statute that might overlap slightly with a general authorization to lease any navigable bedlands to abutting landowners.

¶18 Second, even if two statutes do conflict, the more specific statute controls. *Bowles,* 121 Wn.2d at 78. Here, the more specific statute is the one pertaining only to tidal bedlands and governing aquaculture leases. We give preference to RCW 79.135.110(1). Moreover, RCW 79.135.110(1) is also the more recently enacted statute as the legislature amended the statute in 1979. LAWS OF 1979, 1st Ex. Sess., ch. 123, § 1. On the other hand, the legislature passed RCW 79.130.010 in 1953. LAWS OF 1953, ch. 153, § 1. When two statutes conflict, we also give preference to the more recently enacted statute. *Tunstall v. Bergeson*, 141 Wn.2d 201, 211, 5 P.3d 691 (2000), *cert. denied*, 532 U.S. 920 (2001). Thus, even if the statutes did conflict, we would resolve the conflict in favor of RCW 79.135.110(1).

¶19 Echo Bay asserts that the legislature intends RCW 79.130.010 to protect abutting landowners' interests and allow them to control the uses of neighboring tidelands. Based on this assertion, Echo Bay argues that DNR's interpretation undermines that goal. But Echo Bay produces no evidence that the legislature intends RCW 79-.130.010 to protect landowners' interests, and nothing in the statutory language implies such intent. That statute merely authorizes DNR to lease bedlands; it does not protect landowner's rights.

¶20 Four problems are readily apparent under Echo Bay's position: (1) the statutory phrase "[a]ny person" would have to be judicially interpreted to mean "any abutting landowner . . . ," RCW 79.135.120; (2) the competitive bidding structure for obtaining a lease would be nonsensical because only one person would be able to bid; (3) under RCW 79.135.120, any person could file an application, but only one person would be entitled to lease the bedlands—thus, this provision would be useless and without meaning; and (4) RCW 79.135.110(2) provides that

"[n]othing in this section shall prevent *any person* from leasing more than one parcel . . . ." (emphasis added). This permissive phrase would have been differently phrased if it were limited to abutting persons (we would have to interpret it to mean " . . . any person, so long as they were abutting landowners or lessees").

¶21 Echo Bay is not without protection under other relevant statutes. The legislature intended the Shoreline Management Act of 1971 (Act), ch. 90.58 RCW, to balance the competing interests of commercial and residential development. RCW 90.58.020 ("It is the policy of the state to provide for the management of the shorelines of the state by planning for and fostering all reasonable and appropriate uses."). In fact, Echo Bay challenged F/V Puget's lease under the Act's shoreline development provisions allowing neighbors to voice concerns about shoreline developments. The Act adequately protects such landowners' interests.

¶22 Pointing to the DNR policy handbook, Echo Bay also argues that DNR agrees that it may lease only to abutting landowners. This manual, following RCW 79.130.010, indicates that bedlands may be leased only to the owner of abutting tidelands or shorelands. But Echo Bay misstates the significance of this manual. The manual describes DNR's statutory authority under that specific statute; it has no relevance to our interpretation of an independent and separate statute.

¶23 Thus, we hold that the statute is not ambiguous; the plain language permits "any person" to lease bedlands. The right to lease bedlands for "aquaculture uses" is not exclusive to abutting landowners.

## II. Aquaculture

¶24 Echo Bay next argues that even if RCW 79.135-.110(1) gives DNR authority to lease bedlands to any person for aquaculture purposes, F/V Puget's lease is still invalid because herring pens are not aquaculture. DNR responds that we should defer to its interpretation of the statutes and regulations it administers. We hold that

DNR's interpretation is reasonable and that herring pens constitute aquaculture for the purposes of RCW 79-.135.110(1).

¶25 We apply the same principles of statutory construction described above and our review is de novo. *City of Pasco*, 119 Wn.2d at 507. And because DNR enforces and implements RCW 79.135.110(1), we give DNR's interpretation deference. *Roller v. Dep't of Labor & Indus.*, 128 Wn. App. 922, 926-27, 117 P.3d 385 (2005). We will uphold an agency's interpretation if it reflects a plausible construction of the statutory language and is not contrary to legislative intent and purpose. *Roller*, 128 Wn. App. at 926-27.

¶26 RCW 79.135.110 does not define "other aquaculture use," but DNR has defined the term in its regulations:

> "Aquaculture" means the culture and/or farming of food fish, shellfish, and other aquatic plants and animals in fresh water, brackish water or salt water areas. Aquaculture practices may include but are not limited to hatching, seeding or planting, cultivating, feeding, raising, harvesting of planted crops or of natural crops so as to maintain an optimum yield, and processing of aquatic plants or animals.

WAC 332-30-106(4). DNR relies on the portion of this definition that provides for the processing of aquatic animals to argue that F/V Puget's lease is valid.

¶27 The regulation does not define "processing" but, where a regulation or statute does not define terms, we may look to a dictionary for guidance. *State v. Myers*, 133 Wn.2d 26, 33, 941 P.2d 1102 (1997). "Process," as a verb, means:

> to subject to a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result

or

> to prepare for market, manufacture, or other commercial use by subjecting to some process

or

> to make useable by special treatment.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1808 (2002). Under any of these definitions, placing herring in net pens in order to rid the fish of bacteria, thereby making them easier to freeze, qualifies as processing an aquatic animal. This process achieves the particular result of making the herring amenable to preservation, preparing the fish for market, and rendering the herring useable as bait fish. Thus, under DNR's definition, herring net pens are aquaculture.

¶28 We defer to DNR's definition of "aquaculture" in RCW 79.135.110(1). As indicated above, the legislature described its purpose in amending that statute as, "The purposes for which the bedlands may be leased are expanded to include all aquacultural uses." Doc. "H.B. 913," S. Comm. on Natural Res., 46th Leg., 1st Ex. Sess. (Wash. 1979) (on file with Wash. State Archives). The adjective "all" suggests that the legislature intended "aquaculture" to be interpreted broadly. Had the legislature intended a more narrow definition, it could have so indicated.

¶29 Echo Bay argues that herring net pens are not processing because F/V Puget performs further processing at an upland plant. F/V Puget's plan states:

> After [two weeks in the net pen], herring are removed from the pens, processed at an upland location and sold by the dozen as bait-fish to sport fishermen.

AR at 447. We reject Echo Bay's reasoning.

¶30 First, F/V Puget's description of its operation has no significance in terms of statutory construction. Second, although F/V Puget processes the herring at an upland location, that does not mean penning and withholding food from the herring is not part of the overall processing of this aquatic animal. The upland processing is an integral part of the operation. DNR's interpretation is consistent with the general statutory scheme: Under management guidelines, RCW 79.105.030(2) includes fostering water-dependent

uses, and it is consistent with RCW 79.105.050 that authorizes DNR to "develop and improve production and harvesting of seaweeds and sealife . . . contained in aquaculture containers."

¶31 Echo Bay also disputes that DNR defines withholding food from fish in herring net pens as "aquaculture." It points out that DNR's policy manual describes aquaculture as "raising fin fish in floating net pens." AR at 697. Assuming without deciding that "raising" fin fish does not include controlling their diet in order to achieve a particular result, Echo Bay's argument misstates DNR's overall treatment of herring net pens. In its program summary, for example, DNR recounts that the "[p]rimary aquaculture activities addressed . . . are shellfish harvesting (excluding geoduck activities), net pen aquaculture, and seaweed aquaculture. Net-pen aquaculture includes salmon aquaculture and herring operations." AR at 877. DNR currently has five aquaculture leases for herring net pens, covering a total of 4.3 acres of bedlands. And DNR's handbook notes that herring net operations are a portion of its overall leasing program on public aquatic lands. In short, the record makes it clear that DNR has historically treated herring net pens as aquaculture.

¶32 Lastly, Echo Bay asserts that we should adopt the Department of Agriculture's definition of "aquaculture" in RCW 15.85.020(1): "the process of growing, farming, or cultivating private sector culture aquatic products in marine or freshwaters and includes management by an aquatic farmer." This argument fails for two reasons. First, the statute limits the definition to Title 15 RCW. RCW 15.85.020. Thus, by its own terms, this definition does not apply to RCW 79.135.110(1).

¶33 Second, herring net pens would satisfy this statute. As Echo Bay points out, while withholding food from the herring might not qualify as growing or cultivating an aquatic product, it is management of an aquatic product by

an aquatic farmer. F/V Puget manages its catch for two weeks to improve the marketability of its product.

¶34 Affirmed.

ARMSTRONG and QUINN-BRINTNALL, JJ., concur.

Review denied at 163 Wn.2d 1016 (2008).