[No. 33587. Department Two. January 25, 1957.]

PACIFIC NORTHWEST ALLOYS, INC., *Respondent,* v. THE STATE OF WASHINGTON, *Appellant.*[1]

*The Attorney General* and *Keith Grim, Assistant,* for appellant.

*Paine, Lowe, Coffin & Herman, R. E. Lowe,* and *Alan P. O'Kelly,* for respondent.

OTT, J.—The state tax commission assessed a use tax against Pacific Northwest Alloys, Inc., hereinafter referred to as the company. The tax was paid. The company's petition to the commission for refund was denied. This action was commenced to recover the payment, pursuant to RCW 82.32.180.

The cause was tried to the court upon stipulated facts, which the court adopted as its findings. The court's findings disclose that the company is engaged in the manufacture of

[1]Reported in 306 P. (2d) 197.

a metal alloy known as ferrosilicon, the components of which are iron and silicon. The raw materials used to manufacture ferrosilicon are scrap iron, hydrate quartz, coal, coke, and wood chips. Heat only is necessary to manufacture ferrosilicon from these raw materials.

The materials are introduced into an electric furnace which the company uses in manufacturing the alloy. Three carbon electrodes protrude from above the furnace into the charge to a depth of about five feet. The electrodes, nipples, and joint compound are composed of pure carbon made from finely pulverized anthracite coal, coke, and pitch. While other material may be used for electrodes, carbon is the most desirable material because it withstands, with the least oxidation, the high heat which is generated in the furnace and, upon oxidation, does not introduce any impurities or unwanted materials into the charge. The electrodes are threaded at each end so that others can be attached to permit continuous feeding into the furnace as they are consumed. The electrodes are used to introduce electric current into the furnace, which creates the heat necessary for the chemical process to occur. The current passes between the electrodes through the charge and brings the heat in the furnace to approximately two thousand degrees centigrade. At this heat, the carbon which is present in the mix unites with the oxygen in the quartz, creating carbon monoxide.

The coal, coke, and wood chips are used for the purpose of supplying carbon which, in the presence of the heat, chemically reacts with the quartz to produce silicon and carbon monoxide. The silicon unites with the iron to form ferrosilicon. No attempt is made to gather the carbon monoxide. It passes off into the atmosphere as waste.

In the reduction of 165,800 pounds of raw materials (steel borings 40,800 pounds; silica rock (quartz) 72,000 pounds; coke, coal, and wood chips 53,000 pounds) consumed in one day in producing fifty per cent ferrosilicon, approximately 2,500 pounds of electrodes, nipples, and joint compound are consumed.

As the electrodes are consumed, a part of the carbon in them reacts with the quartz in the same manner as does the carbon supplied by the coal, coke, and wood chips. An undetermined amount of the carbon also reacts with free oxygen in the air to form carbon monoxide.

Query: As to the electrodes used, is the plaintiff company a consumer, as defined by the use tax law, and subject to the tax?

RCW 82.12.020 provides, in part:

"There is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of using within this state *as a consumer* any article of tangible personal property purchased at retail, or acquired by lease or by gift, or extracted or produced or manufactured by the person so using the same: . . ." (Italics ours.)

A consumer is defined by RCW 82.04.190 as:

"(1) Any person who purchases, acquires, owns, holds, or uses any article of tangible personal property other than for the purpose of resale as tangible personal property in the regular course of business or for the purpose of consuming such property in producing for sale a new article of tangible personal property or a new substance, of which such property becomes an ingredient or component *or is a chemical used in processing, when the primary purpose of such chemical is to create a chemical reaction directly through contact with an ingredient of a new article being produced for sale;* . . ." (Italics ours.)

The trial court concluded that the carbon electrodes, upon which the use tax was levied, constituted a chemical used in processing and that *a primary purpose of such chemical was to create a chemical reaction* directly through contact with an ingredient of a new article being produced for sale, and that the electrodes were, therefore, not subject to the use tax.

From a judgment directing a refund of the tax payment, the state has appealed.

The appellant's principal assignment of error is that, conceding that a primary purpose of the carbon is to create a chemical reaction, such a conclusion does not meet the requirements of the statutory exemption which requires that

the primary purpose of the electrodes must be to furnish carbon rather than heat.

■ What do the words, "primary purpose," mean? A cardinal rule of statutory construction is that the words to be construed must be given their usual and ordinary meaning. *State v. Houck,* 32 Wn. (2d) 681, 685, 203 P. (2d) 693 (1949); *Sandona v. Cle Elum,* 37 Wn. (2d) 831, 837, 226 P. (2d) 889 (1951).

In Black's Law Dictionary (4th ed.), "primary" is defined as "First; principal; chief; leading." "Primary purpose" is defined as "That which is first in intention; which is fundamental."

■ The statute affords exemption only when *the primary purpose* of the electrode is to create a chemical reaction. According to the stipulated facts, "The electrodes are used to introduce electric current into the furnace." Electrodes are a manufactured article designed to conduct electricity. The fact that the electrodes used in this process are made of carbon and the carbon consumed by oxidation is only incidental. The stipulation concedes that these electrodes are used principally in this process to conduct electricity into the furnace. The carbon furnished by the electrodes is only a small portion of the carbon required to produce the chemical reaction. According to the stipulation, the carbon for the chemical reaction is furnished almost entirely by the coke, coal, and wood chips, of which a daily total of fifty-three thousand pounds are used, as compared with two thousand five hundred pounds of electrodes.

It would appear then, from the stipulated facts, that the *primary purpose* of the electrodes was not "to create a chemical reaction," but that the primary purpose was to conduct the electrical current into the furnace.

The stipulation states that "The coal, coke and wood chips are used for the purpose of supplying carbon." It follows then that, if the charge does not contain a sufficient amount of carbon, the additional amount would not be supplied by introducing another electrode into the furnace, but rather

by adding more coal, coke, and wood chips. The primary purpose of the electrodes, therefore, is not to furnish carbon.

The quoted portion of RCW 82.04.190, as it applies to products manufactured through chemical processes, has never before been presented to us. Neither appellant nor respondent has cited any case directly in point, nor have we been able to find any. However, it would seem that, since the electrodes function principally as a portion of the electrical system of the furnace and are consumed through oxidation because of the intense heat to which they are subjected, and since the carbon from the electrodes contributes only incidentally to effect the amalgamation or fusion of the iron and silicon, the reasoning in *Union Portland Cement Co. v. State Tax Comm.*, 110 Utah 135, 170 P. (2d) 164 (1946), would be apropos:

"The statutes of this state do not exempt machinery used in manufacturing processes from the use or sales tax. The fact that a machine used in the manufacturing process is worn away in whole or part during the manufacturing process and the materials resulting incidentally enter into the products manufactured does not exempt the manufacturer from either the sales or use tax on the purchase or use of that machine."

In *Androscoggin Foundry Co. v. Johnson,* 147 Me. 452, 88 A. (2d) 158 (1952), the use tax had been assessed with respect to coke, the principal function of which was to provide heat. An incidental function was to add carbon to produce the manufactured article. The Maine court said:

"The fact that in using it [coke] as fuel in smelting iron a portion of the carbon of which it is composed becomes an ingredient of the iron in process does not deprive the coke of its character as fuel."

The rationale of these decisions is applicable to the case at bar. The fact that some of the carbon from the electrodes reacts with the raw materials does not change the true character of the electrodes. They are tangible personal property purchased by the respondent consumer for the primary purpose of furnishing the mechanical or material

means by which the electricity (the fuel) is introduced into the furnace.

We conclude that respondent is a consumer, as defined by the statute, and that the stipulated facts do not establish that the electrodes consumed in the process of manufacturing ferrosilicon come within the purview of the exemptions provided therein.

The judgment is reversed, and the cause remanded with instructions to enter a judgment of dismissal.

HILL, C. J., DONWORTH, MALLERY, and WEAVER, JJ., concur.