[No. 39694. En Banc. April 17, 1969.]

FOREMOST DAIRIES, INC., *Appellant,* v. THE STATE TAX COMMISSION, *Respondent.**

*Gagliardi & Gagliardi,* by *S. A. Gagliardi,* for appellant.

*The Attorney General, Henry W. Wager* and *Timothy R. Malone, Assistants,* for respondent.

*Reported in 453 P.2d 870.

NEILL, J.—Plaintiff has paid a deficiency assessment of a wholesale functions tax levied by the State Tax Commission and brings this action for a refund. Judgment was entered upholding the ruling of the tax commission and denying the refund. Plaintiff appeals, contending that its activities as herein set out do not constitute a "wholesale function" within the meaning of RCW 82.04.270(2).

The facts are agreed. Plaintiff maintains a dairy manufacturing and processing plant in Seattle from which dairy products are sold and delivered throughout the Seattle area. Distribution of products from this plant is made by a fleet of delivery trucks. The company maintains an office in this plant where all the records are kept and processed. Sales of the products are accomplished principally by solicitations by route salesmen. Some orders are by telephone calls from customers, and a very few by route drivers contacting new residents on their routes.

Each day the office prepares a load sheet for each delivery truck. This sheet contains a complete list of dairy products which have been ordered and which that particular driver is to deliver that day. The loads are in accordance with the predetermined orders as called for by the route book, which each driver obtains daily from the office, with some extra products for use when a housewife or other consumer requests some additional item. Each driver delivers the products in accordance with the route book.

The company has two loading stations, one at Northgate and one at Renton. The Northgate station is a building equipped with a refrigerated storage room. The company operates four milk routes from this location. It also furnishes dairy products to 15 independent distributors from this location, but these products are not here in issue. Each day a large van loaded with products as determined by the daily order sheet is dispatched from the central plant to the Northgate station where two loaders unload the van onto the station platform and thereafter into the company's route trucks. After the drivers of the delivery trucks have completed their work, they make their reports for that

day to the central office in writing or by telephone. The station has a listed telephone, kept mainly for intercommunication with the company office. If any orders for dairy products are received at the station by telephone or otherwise, the request is immediately relayed to the central office for approval or rejection to be processed there.

Any products left over after the route is completed for the day are stored in the cold storage unit overnight for use by the route driver the next day, or products might be left on the route truck overnight if the truck is refrigerated.

The route driver is forbidden by union rules and the bylaws of the union to solicit any business, except that if a new family moves into the district served by him, and such family is not served by any other dairies, he is permitted to solicit their business. Any new orders obtained by the driver are reported to the central plant for approval or disapproval and are processed there.

The building at the Renton location is equipped with a cold storage room and automotive repair shop. The only differences from the routine described at Northgate are: The large van makes two trips a day from the plant. The products are unloaded into the refrigerated room. During the night, two loaders load the delivery trucks from the cold storage room. All trucks are loaded prior to 7 a.m., at which time the drivers report to work and proceed as described above.

The company maintains four relief drivers and one supervisor of the drivers at this Renton facility. The relief drivers are there to take over the routes of any driver who fails to report for work or is unable to carry on his route. The supervisor supervises the work of all the drivers. There are two office girls who check the products in and out, make settlement with the drivers and deposit any cash collected directly into the company's bank account. These girls report their actions to the central office, and that office makes permanent records of all transactions. This facility also has a listed telephone which is mainly for intercommunication between this station and the main plant.

In all instances, the customers are billed from the central office. All records are kept at the central dairy plant. No permanent records are kept at either the Northgate or the Renton location.

RCW 82.04.270(2), insofar as the issue here is concerned, provides:

(2) The tax . . . shall be collected from every person engaged in the business of distributing . . . personal property, owned by them from their own warehouse or other central location in this state to two or more of their own retail stores or outlets, where no change of title or ownership occurs, the intent hereof being to impose a tax equal to the wholesaler's tax upon persons performing functions essentially comparable to those of a wholesaler, but not actually making sales: . . . *Provided further,* That delivery trucks or vans will not . . . be considered to be retail stores or outlets.

It was the obvious intent of the legislature to tax as a "wholesaling function" the horizontal merchandising scheme which competes with and, except for change of title to goods, is essentially similar to the typical vertical division of merchandising whereby goods are sold by manufacturers/processors to a jobber/wholesaler and on to the retailer for sale to the ultimate consumer.

The tax commission relies on *Standard Oil Co. v. State,* 57 Wn.2d 56, 355 P.2d 349 (1960). There we held the wholesale functions tax applicable when the taxpayer delivered its own goods to its own bulk plants and such goods were then sold from the bulk plants to ultimate consumers. We stated, at 62:

It [Standard Oil] does not deny that the sales made at its bulk plants were retail sales . . . but endeavors to persuade the court that they were not made from a retail outlet. We are at a loss to understand what a retail outlet is if it is not a place from which retail sales are made, and are unable to find in the statute any suggestion that the Legislature intended another definition.

Standard Oil did not question that retail sales were being made from its bulk plants, and the question for this court

was whether a place where retail sales were taking place was necessarily a "retail outlet." Accordingly, we held that the transfer of petroleum products from terminal tank farms to bulk plants from which sales were made to consumers was essentially comparable to wholesaling and subject to the tax.

The precise issue presented here, namely, whether there were retail sales taking place at the loading stations, was not raised in *Standard Oil Co. v. State, supra.* The terms "retail sale," "retail store," and "retail outlet" all connote some sort of merchandising activity where there is interaction with the market and the consumer.

The legislature has defined the term "retail store or outlet" in RCW 82.04.212, but this definition is in the negative and is of no assistance in resolving the issue before us. Words of a statute, unless otherwise defined, must be given their usual and ordinary meaning. *Pacific Northwest Alloys, Inc. v. State,* 49 Wn.2d 702, 306 P.2d 197 (1957). Merriam-Webster's Third New International Dictionary (1963) defines "retail store" as "a place . . . in which merchandise is sold primarily to ultimate consumers," and "outlet" as a "market for a commodity."

When the term "retail store or outlet" is read in toto, it obviously refers to the place where the creator of goods meets the consumer in the distributive process—the point at which the consumer becomes aware of the product, deals with the merchandiser or his agent, and eventually buys the product. Of course these various activities may occur at different times and locations. Advertisements to the consumer may originate from one outlet. The consumer may first see the product someplace else. A sale may be negotiated, a contract signed and accepted, and the goods eventually delivered, all at different locations. However, we can meet such problems when they arise. The point is that none of these activities occur on the loading platform at Northgate or in the refrigerated storage room at Renton.

The vast majority of the orders for plaintiff's products are solicited and all of the orders are accepted at the main

plant. Some of the orders were taken and the goods were delivered by the delivery truck drivers—which trucks are specifically exempted by the statute from the class of "retail stores or outlets." In short, plaintiff meets the public almost entirely through its delivery drivers and its main office. Most of the public is probably not even aware of the loading stations, and plaintiff did not intend the public to be aware of them. The loading stations were not intended to be, nor were they used as retail outlets.

If plaintiff is performing functions essentially comparable to a wholesaler, it is doing so by sending goods to the loading stations, temporarily storing them there, and then delivering them to their true retail outlets—the delivery trucks. However, the delivery trucks, by statutory exemption, are not retail outlets. To characterize this process as wholesaling at the main plant and retailing at the loading station is a strained construction of those terms.

 It is a basic rule of construction that " 'if there is any doubt as to the meaning of a taxing statute, it must be construed most strongly against the taxing power in favor of the citizen.' " *In re Estate of Ehler,* 53 Wn.2d 679, 681, 335 P.2d 823 (1959). The rule should be no less when interpreting the facts in a tax case and concluding therefrom the applicability of a taxing statute.

Reversed.

HILL, WEAVER, HALE, and McGOVERN, JJ., and ARMSTRONG, J. Pro Tem., concur.

HUNTER, C. J. (dissenting)—I dissent. RCW 82.04.270(2) provides a tax upon "functions essentially comparable to those of a wholesaler." The majority opinion correctly points out that delivery trucks or vans are not considered to be retail outlets under said statute. However, we are not dealing in terms of mere delivery vans. The activity of Foremost at the Renton and Northgate stations bears this out. The Renton station serves 18 Foremost delivery routes and 9 independent distributors. It has a cold storage room and automotive repair shop. Employees working there, in

addition to the route drivers, are a drivers' supervisor, four relief drivers, two loaders, and two office girls. The office girls check the products in and out, make settlements with the route drivers, and deposit cash received directly in the bank rather than forwarding it to the main plant. There is a listed telephone by means of which customers may place orders. Any such orders are referred to the main office for acceptance and processing. The main plant sends two vans daily to the station. These are unloaded into the cold storage room, and the route trucks are loaded during the night from that room.

The Northgate station, which serves 4 Foremost delivery routes, also serves 15 independent distributors. At Northgate there is a loading platform, a refrigerated storage room, and a listed telephone. Two loaders are employed at this station. The loaders unload the dairy products from the van which comes every day from the main plant and reload them onto the delivery trucks. At the two stations Foremost serves a total of 24 independent distributors, but only 22 company routes.

Foremost contends that both the tax commission and the trial court erred in holding that the Renton and Northgate stations are "retail stores or outlets" as defined in RCW 82.04.270(2). It argues that its stations are not "retail outlets" because retail sales are not made from the stations, but rather are made from the main plant. This is not what the tax statute encompasses. It is a tax upon functions essentially comparable to those of a wholesaler:

(2) The tax imposed by this section is levied and shall be collected from every person engaged in the business of distributing in this state articles of tangible personal property, owned by them from their own warehouse or other central location in this state to *two or more* of their own retail stores *or outlets, where no change of title or ownership occurs,* the intent hereof being to impose a tax equal to the wholesaler's tax upon persons performing *functions essentially comparable to those of a wholesaler, but not actually making sales*: . . .

(Italics ours.)

Applying the statute to the instant case, the test is whether the functional operations of the two stations are, in the language of RCW 82.04.270(2), "essentially comparable to those of a wholesaler," even though no actual sale is made and even "where no change of title or ownership occurs."

The chief distinction between distribution by Foremost to the independent distributors and to its own delivery trucks is that in the latter instance there is no change of title or ownership of the dairy products. However, the statute, *supra,* specifically provides that this distinction is not enough to justify the exemption as long as the function is otherwise comparable to a wholesale operation.

In summary, the record discloses that the functions performed by the Renton and Northgate stations include functions normally performed by retail stores or outlets. The stations can and do receive direct customer orders by telephone. The route drivers, who work from the stations, can and do solicit and accept orders from new prospective customers—other solicitation is prohibited by union, not company, rules. Surplus products are left at the stations after each day's deliveries to be reloaded the following day. Route drivers have physical contact only with the stations. Foremost maintains a supervisor, relief drivers, and an office force at the Renton station. The stations are not mere loading platforms, and even though they may not be retail "stores" in the sense in which the word is commonly understood, they are within the meaning of retail "outlets" as used by the legislature in RCW 82.04.270(2), in that the entire operation of Foremost is essentially comparable to that of a wholesaler, although such sales are not actually made. See, *Standard Oil Co. v. State,* 57 Wn.2d 56, 355 P.2d 349 (1960).

The judgment should be affirmed.

HAMILTON, J., concurs with HUNTER, C. J.

FINLEY, J. (dissenting)—The majority opinion makes a valiant but unconvincing and ineffective effort to distin-

guish the problem involved in the instant appeal from the one involved in our decision in *Standard Oil Co. v. State*, 57 Wn.2d 56, 355 P.2d 349 (1960). The majority's rationalization, when critically and realistically analyzed, is not only rather strained but seems to me to make certain unwarranted assumptions by overlooking several significant and somewhat unique facets of the taxing statute as it has been enacted by the legislature.

It may be said that the results in attempting to untangle a ball of yarn are dependent upon where one starts, *i.e.*, the point of attack or approach. As to the juristic ball of yarn involved in the instant case, it seems to me the approach or point of attack should be significantly different than that of the majority opinion, whereupon as a consequence a different answer or result emerges.

In my judgment, the most significant aspect of the problem is the simple fact that the legislature imposed a tax upon wholesaling activity or wholesalers in subsection (1) of RCW 82.04.270. Having done so, the legislature then proceeded to expand or enlarge the taxing classification and imposed a tax equal to the wholesaler's tax not upon persons classifiable as wholesalers, but upon *persons performing functions essentially comparable to those of a wholesaler but not actually making sales.*

It seems hornbook law in the field of taxation that the legislature occasionally does, and legally can do, some unique—if not somewhat strange—things in prescribing classifications, particularly for the purpose of imposing an excise tax. Such classifications, although perhaps unique and even appearing or sounding somewhat strange, are usually upheld by the courts if they apply equally and reasonably to all persons within the ambit of the classifications prescribed by the legislature. I think the legislature has complied with this basic requirement in connection with the problem involved in the instant appeal. In other words, after imposing a tax upon functions or activities which are clearly "garden variety" wholesaling in nature, the legislature unequivocally expands the ambit of the tax to remove

any tax advantage from merger of wholesale and retail functions in a vertically integrated operation, and thus includes and taxes functions not clearly run-of-the-mill wholesaling in nature.

In this connection, the language of the statute and drafting technique employed could not be more meaningful and clear in denoting that the functions or activities subject to excise taxation are not wholesaling but those "essentially comparable to those of a wholesaler." After the quoted sequence of words, to remove any doubt as to the clarity and application of the taxing statute, the legislature explicitly prescribed that the making of a sale in connection with a comparable wholesale activity would not be a requisite for imposition of the tax.

The majority opinion emphasizes the words "retail stores" and the immediately following words "or outlets." Implicit in this is an inference that a sale, or some kind of sales transaction, is requisite as an essential part of functions or activities "comparable to those of a wholesaler." This flies in the face of the language and the logic of the statute as examined in the preceding paragraph.

The majority opinion relies strongly, and I think improperly, upon the classic—but not always appropriate—rule of statutory construction that "If there is any doubt as to the meaning of a tax statute, it must be construed most strongly against the taxing power in favor of the citizen." *Citing In re Estate of Ehlers,* 53 Wn.2d 679, 335 P.2d 823 (1959). The necessary assumption for application of this general rule of statutory construction is that the particular statute is ambiguous in meaning. I cannot agree with the majority in making such an assumption in the instant case, and then employing the indicated rule of interpretation as a rationalization to invalidate the tax imposed upon the appellant Foremost Dairies, Inc. For the reasons indicated in the foregoing discussion, I am strongly convinced that the legislature, in drafting subsection (2) of RCW 82.04.270, carefully and deliberately chose language which clearly places the appellant within the taxing classification prescribed.

In support of this conclusion I would refer to an additional general, or basic, rule of statutory construction that a statute is to be construed as a whole. If the statute is construed as a whole, the intent of the legislature seems unambiguous to me. It quite clearly subjects the functions or activities of Foremost to the wholesaling tax imposed by subsection (1) of RCW 82.04.270. In my judgment, our previous decision in *Standard Oil*, is not distinguishable and in itself should be controlling and dispositive of the instant appeal. I join Hunter, C. J., in his dissent in this matter.