[No. 33315-5-II. Division Two. January 31, 2006.]

TEXACO REFINING AND MARKETING, INC., *Appellant*, v. THE DEPARTMENT OF REVENUE, *Respondent*.

*Garry G. Fujita, Michele G. Radosevich, Jennifer L. Long,* and *D. Bruce Lamka* (of *Davis Wright Tremaine, L.L.P.*), for appellant.

*Robert M. McKenna, Attorney General,* and *Anne E. Egeler, Senior Counsel,* and *Debra E. Casparian, Assistant,* for respondent.

*Thomas M. McBride* and *Kristopher I. Tefft* on behalf of Association of Washington Business, amicus curiae.

¶1 BRIDGEWATER, J. — Texaco Refining and Marketing, Inc. (Texaco), appeals from a summary judgment order that the Department of Revenue (DOR) employed the proper method of valuation for calculating the manufacturing business and occupation (B&O) tax on petroleum products exchanged with other refineries under barter agreements. We hold that RCW 82.04.450 requires that a product be valued by the gross proceeds of sale, but where there are no proceeds (as here where there is a barter) the product should be valued by comparable sales. Because that statute is unambiguous, the burden is on the taxpayer, Texaco, to show that the tax was incorrect and then to establish the correct amount. We also hold that Texaco failed in its burden to show that the tax calculated under DOR's valuation method was incorrect and establish the correct amount. We affirm.

¶2 Texaco operated a petroleum refinery in Anacortes until June 1998. To avoid shipping costs, Texaco entered into agreements with other petroleum refiners to exchange similar quality products. Under these exchange agreements, Texaco transferred petroleum products in Washington to its exchange partner for products of similar quality and quantity at its partner's location. For example, Texaco made jet fuel, diesel, and regular gasoline in Anacortes and transferred it to Chevron Corporation in exchange for similar products in Alaska from the Chevron refinery. In addition, Texaco transferred products from Anacortes to out-of-state Texaco storage facilities without selling the products to other entities.

¶3 All of the exchange agreements were barter contracts in which the partners exchanged volumes of products without listing overall price. The exchange contracts were either "spot" or "evergreen" agreements. The spot agreements were short-term delivery contracts. Br. of Resp't at 3; Appellant's Reply Br. at 2. The total volume under these contracts was large, ranging from 133,000 to 215,000 barrels of total products per contract. While the total volume was large, Texaco accounted for the exchanges in smaller

volumes of individual products ranging from 15,000 to 125,000 barrels. Texaco disputes the taxes it paid on three spot agreements with Chevron, Tosco Corporation, and ARCO.

¶4 Evergreen agreements are long-term, umbrella contracts under which the exchange partners trade products running into the millions of barrels. Either party may normally cancel these contracts with 30 to 90 days' notice. While the overall volumes are massive, the evergreen agreements in this case consisted of smaller individual transactions, typically computed on a monthly basis. For example, Texaco's agreement with Shell provided for 16,000 barrels a month of one product and 19,500 of another, with other product volumes to be exchanged on an as agreed basis. According to Texaco's expert, the parties would balance these agreements each month and then nominate the next month's amounts for exchange. Moreover, in its accounting reports for these exchanges, Texaco listed the volumes on a monthly basis. Texaco disputes the taxes levied on three evergreen exchange agreements with ARCO, Shell Oil Company, and Tesoro Corporation.

¶5 Although these evergreen contracts included no overall price term, the parties negotiated a monetary contract differential that took into account the relative difference in geographical pricing, product grades, and transportation costs. Further, when there were disparities in the volume of actual product shipped, the parties balanced the exchange by paying for the difference. Thus, for example, if Texaco received more product than it gave to ARCO, it would settle by paying for the excess amount. Under the spot contracts, the parties specified that they would settle at prices based on the Oil Price Information Service (OPIS) low price for the relevant location. Under the evergreen exchanges, the parties settled disparities on a monthly basis, generally at OPIS or Platts Oilgram (Platts) prices.

¶6 OPIS and Platts are price indices that publish daily spot market prices for petroleum products at specific locations. OPIS and Platts generally report on sales averaging 10,000 to 25,000 barrels per exchange, but a buyer can

obtain up to 50,000 barrels on the spot market. Clerk's Papers (CP) at 280, 853. OPIS gathers information from oil brokers, oil traders, and refiners to determine the spot price for the day. OPIS also considers the prices of actual deals in arriving at a price. Both services indicate that they collect information about specific transactions, but this information is voluntarily given. In any case, the oil industry, including Texaco, relies on both OPIS and Platts. *See Nat'l Petroleum Mktg., Inc. v. Phoenix Fuel Co.*, 902 F. Supp. 1459, 1462 (D. Utah 1995) (noting that OPIS is used throughout the oil industry). DOR's expert indicated in his deposition that the sales OPIS and Platts measure were essentially comparable to the exchange agreements.

¶7 DOR assessed B&O, hazardous substances (HST), and petroleum products (PPT) taxes on the spot and evergreen exchanges, as well as on the products transferred out of state, from January 1, 1991 to December 31, 1996. DOR valued the products according to the OPIS and Platts average spot price. DOR began using the Platts spot price to value petroleum products as a result of negotiations with the oil industry beginning in the 1960s. *In re Petition for Corr. of Assessment & Refund of . . .* , No. 00-124, 22 Wash. Tax Dec. 103, 2000 Wash. Tax LEXIS 395, at *16 (Dep't of Revenue June 30, 2000). DOR initially calculated a discount from the Platts spot price, but the discount was discontinued in the 1970s.

¶8 During the period relevant here, Texaco reported and paid the B&O, HST, and PPT taxes based on the OPIS and Platts valuation numbers. Initially, DOR had valued Texaco's products based on the OPIS rack price, which is a retail price measure. After Texaco's initial appeal, DOR revalued the product at the spot (bulk) rate. *In re Petition for Corr.*, 2000 Wash. Tax LEXIS 395, at *4. Texaco appealed that decision, objecting to the use of OPIS and Platts altogether instead of Texaco's internal accounting valuation. DOR denied the appeal and Texaco appealed to the superior court. Texaco now requests a $5,662,671 refund on these taxes.

¶9 In the superior court proceedings, Texaco and DOR agreed to submit the legal question of the appropriate valuation method. On cross motions for summary judgment, the superior court found that the relevant statutes were not ambiguous. The court began its analysis by finding that the relevant taxable incident was the individual exchanges of product rather than then entire contract volume. The court also indicated that the Washington Administrative Code (WAC) established a hierarchy of appropriate methodologies for calculating a product's value. The court denied Texaco's motion because Texaco failed to meet its burden to demonstrate a true comparative value.

I. Taxing Statute

¶10 As a preliminary matter, the parties dispute the applicable tax. Texaco argues that the applicable tax is the wholesale B&O tax, while the DOR asserts that the manufacturing tax applies. For clarity, the applicable tax is the manufacturing tax, but because both taxes are calculated in exactly the same way, the issue is not significant.

¶11 Washington taxes "every person engaging within this state in business as a manufacturer." RCW 82-.04.240. The State also taxes every person who "mak[es] sales at wholesale." RCW 82.04.270. A person engaged in both manufacture and wholesale is taxable under both provisions. RCW 82.04.440(1). Washington considers intercompany exchanges of products to be wholesale sales. *Time Oil Co. v. State*, 79 Wn.2d 143, 145, 483 P.2d 628 (1971). Because Texaco created petroleum products in Washington and transferred them to other companies, it was subject to both a manufacturing and wholesale tax. For the transfers to its own out-of-state facilities, however, Texaco is liable only for the manufacturing tax.

¶12 A person who pays the manufacturing tax is allowed a credit against wholesale tax. RCW 82.04.440(2). Because both taxes are computed in the same manner, a person who pays the manufacturing tax receives a credit

exactly equal to the wholesale tax. Accordingly, the applicable tax is the manufacturing tax, even though, as a practical matter, the taxes could be computed under either statute.

## II. Valuation for Tax

¶13 The manufacturing tax statute requires that a product be valued by the gross proceeds of sale. RCW 82-.04.450(1). Texaco argues that, under the statute, its internal cost valuation represents the gross proceeds of an intercompany exchange. Because Texaco's internal cost valuation does not represent the exchanged products' fair market value, Texaco's accounting numbers do not represent the actual gross proceeds of the exchange agreements.

■ ■ ¶14 Statutory interpretation is a legal question we review de novo. *Am. Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 5, 802 P.2d 784 (1991). The court's fundamental duty is to ascertain and carry out the legislature's intent. *United States Tobacco Sales & Mktg. Co. v. Dep't of Revenue*, 96 Wn. App. 932, 938, 982 P.2d 652 (1999). A statute or regulation is ambiguous if it has more than one reasonable interpretation. *McLane Co. v. Dep't of Revenue*, 105 Wn. App. 409, 413, 19 P.3d 1119, *review denied*, 145 Wn.2d 1005 (2001). If a statute is plain and unambiguous, we must derive its meaning solely from the statutory language. *Harmon v. Dep't of Soc. & Health Servs.*, 134 Wn.2d 523, 530, 951 P.2d 770 (1998). Words in the statute are given their plain and ordinary meanings. *N. Coast Air Servs., Ltd., v. Grumman Corp.*, 111 Wn.2d 315, 321, 759 P.2d 405 (1988). If the statute does not define a nontechnical word, the court may look to a dictionary for guidance. *State v. Myers*, 133 Wn.2d 26, 33, 941 P.2d 1102 (1997).

■ ¶15 RCW 82.04.240 measures the B&O tax by the "value of the products" manufactured, regardless of place of sale. RCW 82.04.240. The "value of products" is determined by the "gross proceeds derived from the sale." RCW 82-

.04.450(1).[1] The statute defines "[g]ross proceeds of sales" as the "value proceeding or accruing" from the sale. RCW 82.04.070. And "[v]alue proceeding or accruing" means "consideration, whether money, credits, rights, or other property expressed in terms of money." RCW 82-.04.090.

¶16 If a product is transferred without a sale under circumstances where the gross proceeds are not indicative of "true value," RCW 82.04.450(2) requires that the value taxed "correspond as nearly as possible to the gross proceeds from sales in this state of similar products of like quality and character, and in similar quantities by other taxpayers." Again, we stress that because this is a barter situation, there are no monetary "gross proceeds" from the sale, so a comparative value must be used to determine value. The administrative code elaborates this provision, providing:

> [T]he value shall correspond as nearly as possible to the gross proceeds from other sales at comparable locations in this state of similar products of like quality and character, in similar quantities, under comparable conditions of sale, to comparable purchasers . . . .

---

[1] RCW 82.04.450 provides:

(1) The value of products, including byproducts, extracted or manufactured *shall be determined by the gross proceeds derived from the sale thereof whether such sale is at wholesale or at retail,* to which shall be added all subsidies and bonuses received from the purchaser or from any other person with respect to the extraction, manufacture, or sale of such products or byproducts by the seller, *except:*

. . . .

(b) Where such products, including byproducts, are shipped, transported or transferred out of the state, or to another person, without prior sale or *are sold under circumstances such that the gross proceeds from the sale are not indicative of the true value of the subject matter of the sale.*

(2) In the above cases *the value shall correspond as nearly as possible to the gross proceeds from sales in this state of similar products of like quality and character, and in similar quantities by other taxpayers,* plus the amount of subsidies and bonuses ordinarily payable by the purchaser or by any third person with respect to the extraction, manufacture, or sale of such products . . . . The department of revenue shall prescribe uniform and equitable rules for the purpose of ascertaining such values.

(Emphasis added.)

In the absence of sales of similar products as a guide to value, such value may be determined upon a cost basis.

WAC 458-20-112 (Rule 112). Thus, in a situation in which a sale does not produce a true value in monetary terms, the statute and administrative code establish a hierarchy of valuation methods. First, the DOR should determine comparable sales values or, in the absence of comparable sales, determine the value based on production costs.[2]

¶17 In this case, Texaco and its exchange partners did not set a monetary value for the petroleum products exchanged. Instead, the partners simply exchanged products with a monetary differential to account for the differences in price between the relevant locations. Thus, Texaco's consideration under these contracts was the actual petroleum products plus a cash differential. As the statute requires DOR to measure the value of the consideration received, DOR must value the petroleum product that Texaco received in exchange for its own product.

¶18 Texaco argues that its internal cost valuation represents the value of the exchanged product. In order to be considered the actual gross proceeds, Texaco's internal valuation numbers for the exchanged product would have to represent the "true value." RCW 82.04.450(1)(b). "True value," in the context of this statute, means the fair market value. The dictionary lists "true value" as a synonym for "fair market value." BLACK'S LAW DICTIONARY 1587 (8th ed. 2004). In addition, under "true value" the dictionary lists "[s]ee *fair market value*." BLACK'S LAW DICTIONARY 1546. Fair market value means the amount that a willing buyer would pay a seller who is not obligated to sell. *United States Tobacco Sales*, 96 Wn. App. at 940.

¶19 Texaco's argument fails for two reasons. First, a tax measured by the sale price is intended to measure the tax

---

[2] DOR observed at oral argument that RCW 82.04.450 contemplates using cost figures only for prototypes. The administrative code is written more broadly and implies cost may be used to determine comparable value. WAC 458-20-112. Because we resolve the issue regarding comparable sales by Platts and OPIS, we need not reach this issue and express no opinion on whether the statute and administrative code conflict.

at the cost to the buyer, not the seller. *See, e.g., Klickitat County v. Jenner*, 15 Wn.2d 373, 382, 130 P.2d 880 (1942) (finding a retail sales tax was intended to measure the cost to the buyer and not the seller). Texaco's internal cost numbers do not measure the price a willing buyer would be willing to pay; they measure only at what price Texaco might sell. Second, Texaco and its exchange partners do not disclose their relative costs of production in the negotiations. Thus, those figures were not part of the bargain and should not be used to measure what a willing buyer would pay for the product. Ultimately, Texaco's contract was merely for a volume of petroleum product, however it was valued. Therefore, the statute requires that DOR look for comparable sales to value the product.

## III. Burden

¶20 We must also address what burden Texaco bears in challenging DOR's method of valuation. This is an issue of first impression. Texaco argues that this court should follow the common law rule of interpreting taxing statutes against the taxing authority. DOR urges this court to follow the trial court in applying RCW 82.32.180 to require Texaco to prove it is entitled to a refund. Because the common law rule applies to ambiguity in statutory construction and the statutes here are not ambiguous, DOR's argument is compelling.

¶21 We may not rewrite the statute to require the comparative value most favorable to the taxpayer. Our guide is legislative intent even if it leads to potentially unfair taxation. *See McFreeze Corp. v. Dep't of Revenue*, 102 Wn. App. 196, 201, 6 P.3d 1187 (2000). The common law rule Texaco relies on applies when " 'any doubt exists as to the meaning of a taxation statute,' " not when a taxation statute requires a factual determination. *Agrilink Foods, Inc. v. Dep't of Revenue*, 153 Wn.2d 392, 396-97, 103 P.3d 1226 (2005) (quoting *Ski Acres, Inc. v. Kittitas County*, 118 Wn.2d 852, 857, 827 P.2d 1000 (1992)). Accordingly, the

pro-taxpayer rule "is inapplicable unless it can be automatically assumed, or proved, that the statute in question is ambiguous or its meaning is doubtful." *Dravo Corp. v. City of Tacoma*, 80 Wn.2d 590, 595, 496 P.2d 504 (1972).

¶22 In refund actions, the taxpayer has the burden to "prove that the tax as paid by the taxpayer is incorrect, either in whole or in part, and to establish the correct amount of the tax." RCW 82.32.180. We agree with DOR that the statute imposes two burdens on the taxpayer. The taxpayer must (1) show the tax paid was incorrect and (2) establish the correct amount. According to DOR, this burden requires Texaco to introduce evidence that the OPIS and Platts valuation measure was not comparable to the exchange agreement. On summary judgment, the specific burden was to produce an issue of material fact as to whether OPIS and Platts produced a comparable sales price for the exchanged products and then to provide a correct valuation. RCW 82.32.180.

¶23 Texaco, joined by the Association of Washington Business (AWB), urges this court to apply the common law rule that " 'if there is any doubt as to the meaning of a taxing statute, it must be construed most strongly against the taxing power in favor of the citizen.' " *Foremost Dairies, Inc. v. State Tax Comm'n*, 75 Wn.2d 758, 763, 453 P.2d 870 (1969) (quoting *In re Estate of Ehler*, 53 Wn.2d 679, 681, 335 P.2d 823 (1959)). Texaco argues that this rule applies both to the interpretation of a taxing statute and the applicability of a taxing statute to specific facts. Thus, Texaco and AWB cast the issue as a question of statutory interpretation.

¶24 The statute and regulations here are unambiguous. Where a statute uses plain language and defines essential terms, it is not ambiguous. *McFreeze Corp.*, 102 Wn. App. at 199. Here, the statute and regulation provide a very detailed definition of a comparable sale. A comparable sale is one to (1) comparable purchasers (2) at comparable locations (3) under comparable conditions of sale and (4) involve similar quality products (5) in similar quantities. WAC

458-20-112. The comparison required need not be exact but rather "as nearly as possible." RCW 82.04.450(2). The parties do not dispute the test but only whether OPIS and Platts provide a comparable sales price.

¶25 Texaco, nonetheless, argues that the pro-taxpayer rule applies. It relies on language in *Foremost* indicating that the "rule should be no less when interpreting the facts in a tax case and concluding therefrom the applicability of a taxing statute." *Foremost*, 75 Wn.2d at 763. In *Foremost*, the court addressed whether a particular dairy was a retail store or an outlet on the basis of stipulated facts. *Foremost*, 75 Wn.2d at 759, 762. The court ultimately concluded that the tax was inapplicable to the dairy. *Foremost*, 75 Wn.2d at 762-63. Texaco also cites two other cases for this proposition: *Ski Acres, Inc.*, 118 Wn.2d 852, and *Shurgard Mini-Storage of Tumwater v. Department of Revenue*, 40 Wn. App. 721, 700 P.2d 1176 (1985). In *Ski Acres*, the court found that ski tickets were not "admission charges" under the statute. *Ski Acres*, 118 Wn.2d at 855, 858. In *Shurgard*, the court determined that its task was to determine the kind of businesses the legislature intended to include as "public service businesses" and concluded that storage facilities were not included. *Shurgard*, 40 Wn. App. at 726-27.

¶26 These cases are distinguishable. First, they all address ambiguity in the statutory language itself. *Foremost*, the case on which Texaco places the most reliance, interpreted the applicability of a statutory term. *Foremost*, 75 Wn.2d at 763. Here, the statute is not ambiguous but calls for a factual determination of comparability. The statutory canon of construction does not apply to a court's fact finding. Second, these cases address whether particular business or activity was taxable. Here, Texaco concedes the applicability of the statute to its activity and challenges only the computation of value under the statute. Thus, this line of cases is not applicable.

¶27 Texaco and AWB also argue that Rule 112 is ambiguous because the trial court observed that there were legitimate arguments on both sides regarding whether OPIS and

Platts were comparable. Texaco asserts that the trial court's oral observation "there are legitimate arguments on both sides" means that there is more than one reasonable interpretation of Rule 112. CP at 1865. This misstates the trial court's position. The trial court went on to find that the "there isn't ambiguity in the statutes." CP at 1865. Regardless, we review the trial court's legal conclusions de novo and are not bound by the lower court's reasoning. *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 148, 3 P.3d 741 (2000).

¶28 The trial court's position on the taxpayer's burden was, in any case, correct. The issue is whether Texaco sustained its burden to show that DOR's use of OPIS and Platts produced a valuation that was not comparable. Rule 112 defines what makes a sale comparable and requires a factual determination.[3] RCW 82.32.180 allocates the factual burden in a tax refund case to the challenging taxpayer. Therefore, because the statute was not ambiguous, the trial court was correct to apply the statute to place the burden on Texaco to prove that OPIS and Platts spot prices were not comparable valuations of petroleum products.

## IV. Comparable Valuation

¶29 Texaco argues that under Rule 112, OPIS and Platts spot prices are not comparable to the exchange contracts. Specifically, Texaco asserts that (1) the volumes under the exchanges are not comparable, (2) the conditions of sale are different because the spot market does not address long-term contracts, (3) refiners are not comparable purchasers, and (4) the locations are not comparable.[4] Because the monthly volumes are within the OPIS and Platts measure-

---

[3] Texaco notes the parties agreed to submit the legal issue of the proper method of valuation to the trial court. Because the statute requires a factual determination that the valuation was comparable, the trial court properly required Texaco to submit facts showing it was entitled to prevail.

[4] Texaco also argues that OPIS and Platts do not measure actual sales. But Texaco and DOR both agree OPIS and Platts derive their listed prices from actual deals between refiners, oil brokers, and oil traders. This satisfies the

ment values, Texaco and its exchange partners actually used OPIS and Platts to settle between each other, and OPIS and Platts do survey refiners, these arguments are not compelling.

¶30 Texaco and DOR presented this issue to the trial court on cross motions for summary judgment. On review of summary judgment, we engage in the same inquiry as the trial court. *Hill v. J.C. Penney, Inc.*, 70 Wn. App. 225, 238, 852 P.2d 1111, *review denied*, 122 Wn.2d 1023 (1993). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993). We consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. *Clements*, 121 Wn.2d at 249.

¶31 When the parties agree on the facts, whether a statute applies to a particular factual situation is a conclusion of law. *Blake v. Fed. Way Cycle Ctr.*, 40 Wn. App. 302, 309, 698 P.2d 578 (1985). Accordingly, if there are no material issues of fact, the court may resolve this case on summary judgment motions.

¶32 Here, the parties agree about the material facts but dispute the legal conclusions. Both parties agree that OPIS and Platts publish a daily index price for each individual petroleum product based on sales averaging between 10,000 and 25,000 barrels. But a buyer can obtain up to 50,000 barrels on the spot market. OPIS and Platts rely on voluntary reporting of actual deals between refiners, oil brokers, and oil traders in order to set the spot price. The parties also agree that the exchange partners relied on the OPIS and Platts spot prices in handling negotiations. And both services are considered reliable by the oil industry.

¶33 DOR's argument for using OPIS and Platts is bolstered by Texaco's use of OPIS and Platts spot prices in its

statutory requirement that actual sales figures be used to determine comparable value.

contracts. In each of the spot exchanges, the parties agreed that the OPIS spot price for Portland was to be used for liquidating imbalances. Texaco's expert also testified the OPIS spot prices were also used to settle imbalances in the evergreen contracts. Moreover, the use of OPIS and Platts to value oil products began as a part of negotiations between DOR and the oil companies. *In re Petition for Corr.*, 2000 Wash. Tax LEXIS 395, at *16. Given that the exchange partners themselves used OPIS and Platts to price disparities in volume and that the oil companies initially negotiated for the use of Platts spot prices, Texaco's position that those prices do not adequately reflect the value of the exchanged products appears strained.

¶34 Texaco's rebuttal for its own use of the OPIS and Platts prices in the contracts is that the actual volumes liquidated were relatively small and, therefore, could be valued differently than the bulk of the exchanged products. Texaco's assertion that "[c]learly cash settlements of such small quantities . . . are not fair indicators of the value" is, however, unsupported by any citations to the record or authority. Appellant's Reply Br. at 15. As DOR points out, the OPIS and Platts prices are the only price terms in the entire contract. An equally valid interpretation of these contracts was that Texaco and its partners were exchanging products valued at the settlement price, whatever the cost of production.

¶35 Texaco's primary argument is that the volume in its exchange agreements represents a different order of wholesale and thereby should be valued at a lower wholesale price. Rule 112 addresses this concern by requiring a comparable sales price for similar volumes of trade. WAC 458-20-112. The parties acknowledge that the agreements between Texaco and its exchange partners cover millions of barrels in total. DOR's expert admitted in his deposition that OPIS and Platts do not survey these exchange agreements. Therefore, Texaco asserts, the OPIS and Platts spot market is not comparable in terms of volume.

¶36 The trial court below determined that the taxable incidents in this case were the individual daily deliveries. For the purposes of the manufacturing tax, the taxable incident is the manufacturing activity itself. *Reynolds Metals Co. v. State*, 65 Wn.2d 882, 887, 400 P.2d 310 (1965). The court looks to the gross proceeds of the sale only to determine valuation, not to determine the appropriate taxable incident. RCW 82.04.450(1). Accordingly, even though the overall contract volumes may be large, the court properly looked at the actual volumes exchanged as the proper reference for the comparable sales analysis.

¶37 The trial court reasoned that the taxable incidents were the daily deliveries and therefore the volumes actually exchanged were the proper measure of comparison. Calculated by daily volume per product, the OPIS and Platts volumes are comparable to the exchange agreements. For example, Texaco points to daily deliveries of 60,000 to 241,000 gallons. Converting gallons to barrels, this means daily delivery volumes of 1,600 to 5,700 barrels. Under another contract, Texaco contends that it "delivered" 20 truckloads of 215 barrels in a single day. Appellant's Reply Br. at 3. That produces a volume of 4,300 barrels a day. These volumes are within the range of exchanges OPIS and Platts value. Under this rationale, Texaco has not met its burden to show that DOR's valuation is incorrect merely by introducing the total contract exchange volumes.

¶38 But even if the taxable incidents were on monthly volumes, Texaco's theory fails. DOR audits and assesses taxes on the volumes of product on a monthly basis. Texaco accounts for its exchanges on a monthly basis as well. And the evergreen contracts were administered by the month. In the evergreen agreements, for example, the parties used the monthly totals to administer the contracts. The parties would balance these agreements each month and then determine the next month's requirements. Moreover, these megacontracts were typically terminable by either party with 30 to 90 days' notice, making the contracts appear more like month-to-month contracts despite being nominally long term.

¶39 The monthly shipment totals are within OPIS and Platts volume numbers if considered per product.[5] For example, the monthly volume exchanged under one of the umbrella exchange contracts ranged from 16,000 to 19,500 barrels per product.

¶40 The spot exchange agreements are actually larger per product volumes. For the Chevron spot exchange for example, the parties agreed to exchange 15,000, 20,000, 35,000, and 63,000 barrels of various products. For the Tosco spot exchange, the parties agreed to exchange 125,000 barrels of one product and 50,000 barrels of another. For the ARCO spot agreement, the volumes for the individual products were 60,000, 75,000, and 80,000 barrels.

¶41 Under the monthly totals, the OPIS and Platts prices are, therefore, comparable as the record reveals the upper range under OPIS and Platts was 50,000 barrels. That covers the monthly per product exchanges under the evergreen agreements. Some of the spot agreement volumes are larger, up to four times larger than the typical OPIS and Platts volumes. But only some of the product volumes were large enough to exceed OPIS and Platts, and that is not sufficient to render these pricing indexes incomparable to the exchanges.

¶42 DOR's expert opined that OPIS and Platts were comparable despite the volume of the exchange contracts. In contrast, Texaco's expert indicated that prices ought to be lower based on the volume but he offered no estimate as to the true value. While a disagreement between experts might ordinarily create an issue of material fact, Texaco's expert just restated Texaco's legal position that the total volume is larger than is measured by OPIS and Platts. Standing alone, however, total contract volumes do not prove DOR's valuation methodology is not comparable.

---

[5] Texaco aggregates the individual product volumes and accordingly argues that much larger volumes are involved. But OPIS and Platts, however, publish their prices for individual products, so the comparable volume is for the individual products.

Consequently, the trial court did not err in finding that Texaco failed to carry its burden to show that OPIS and Platts produced incomparable valuation.

¶43 Texaco's argument that the exchanges did not involve similar parties in similar conditions to those surveyed by OPIS and Platts is unpersuasive. Texaco admits that OPIS and Platts survey refiners like Texaco but argues that these exchange deals are a larger scale than those measured by OPIS and Platts and therefore involve different parties and conditions. As the exchange agreement between refiners and refiners are surveyed, Texaco cannot argue the OPIS and Platts deal with incomparable parties. Texaco's contention has merit only if the sheer size of the contract is considered.

¶44 Texaco also argues that the locations are not comparable. Two factors undercut this argument. First, Texaco itself uses the spot Portland market in settling the exchanges. Texaco's own practice reveals that location need not be exact to value petroleum products. Thus, the Seattle market should not be considered inadequate merely because it is not Anacortes. Second, DOR allowed a differential for the price of shipping the product from Anacortes to Seattle. Accordingly, that OPIS and Platts do not publish an Anacortes spot market is not fatal to DOR's use of those price indexes as the statute requires only a comparable, not exactly similar, location.

¶45 Texaco's burden was to show that the valuations were not comparable and to show a correct valuation. It failed. Even assuming Texaco did raise a material fact regarding comparability, it produced no facts sufficient to prove the correct valuation. Instead, Texaco merely introduced its production cost figures. Because production costs are not a measure of gross sales, they may not be used to calculate Texaco's manufacturing tax.

¶46 Washington also assesses HST and PPT taxes, measured by the "wholesale value" of the substance. RCW 82.21.030; RCW 82.23A.020. The wholesale value is the "fair market wholesale value, determined as nearly as

possible according to the wholesale selling price at the place of use of similar substances of like quality and character." RCW 82.21.020(5); RCW 82.23A.010(4). Although the language here is slightly different than with regard to the manufacturing tax, our overall analysis is the same. DOR is required to determine the wholesale value of similar substances of like quality and character. Accordingly, the same result follows for the HST and PPT taxes.

¶47 Thus, the OPIS and Platts prices are comparable and the taxation by DOR was proper. Summary judgment was proper.

¶48 Texaco also disputes DOR's valuation of the products Texaco shipped out of state to storage facilities. Because Texaco provided only the cost figures for these products, as with the exchange contracts, Texaco did not meet its evidentiary burden regarding these transfers.

¶49 Affirmed.

QUINN-BRINTNALL, C.J., and HUNT, J., concur.

Review denied at 158 Wn.2d 1012 (2006).